USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/2/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
JOSHUA LINER,

                            Plaintiff,

       -v.-

BRIAN FISCHER, et al.,

                          Defendants.
-----------------------------------------------------------x

REPORT AND RECOMMENDATION

11 Civ. 6711 (PAC) (JLC)

**JAMES L. COTT, United States Magistrate Judge.**

**To The Honorable Paul A. Crotty, United States District Judge:**

    Plaintiff Joshua Liner ("Liner"), an inmate in New York State custody, brings this action pursuant to 42 U.S.C. § 1983. Proceeding pro se, Liner has sued Brian Fischer, Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"); Carl J. Koenigsmann, Chief Medical Doctor for DOCCS; Ada Perez, Superintendent of Downstate Correctional Facility; and L. Wilcox, a Nurse Practitioner at Lakeview Shock Incarceration Correctional Facility (collectively "Defendants"). Liner contends that Defendants have violated his constitutional rights by, inter alia, denying him adequate medication for glaucoma and seizing funds from his inmate account.

    On January 2 and February 8, 2013, Liner moved for two preliminary injunctions. First, he moved for an injunction to stop Defendant Fischer from implementing DOCCS Directive 2788, which provides that under certain circumstances, DOCCS may seize up to 100 percent of any new funds deposited in an inmate's prison account in order to satisfy the inmate's debts (the "100 percent collection policy"). Liner contends that this policy violates his rights under the First and Eighth Amendments because it prevents him from having sufficient funds in his

USDC SDNY
DATE SCANNED 5/2/13

account to buy postage stamps, skin lotion, and other items. Second, Liner moved for an injunction seeking access to legal research materials, contending that defendant Fischer has denied him adequate access to such materials at Southport Correctional Facility ("Southport"), where he is presently incarcerated. For the reasons that follow, I recommend that both of Liner's preliminary injunction motions be denied.[1]

## I. BACKGROUND

### A. Deductions from Liner's Inmate Account

#### 1. DOCCS Directive 2788

DOCCS Directive 2788, entitled "Collection & Repayment of Inmate Advances & Obligations," governs how and when a DOCCS facility will deduct money from an inmate's account without the inmate's consent. (See Declaration of Deputy Superintendent of Administration William Fennessy ("Fennessy Decl.") (Dkt. No. 58), Ex. A (DOCCS Directive 2788, dated March 30, 2012)). Pursuant to Directive 2788, DOCCS will draw on an inmate's funds in order to pay the inmate's debts under several types of circumstances that are relevant to Liner. First, an inmate may have received cash advances from DOCCS to cover the cost of postage,[2] photocopies of medical records or legal materials, or certain other authorized items.[3]

---

[1] On December 20, 2012, Defendants filed a motion to dismiss the amended complaint (Dkt. No. 46), which the Court will address in a separate report and recommendation.

[2] Although cash advances for postage may be for either legal or personal mail (see Fennessy Decl., Ex. A ¶ III(A)), advances for personal mail are limited to "postage for one domestic first class one-ounce letter per month . . ." (Id., Ex. A ¶ III(A)(2)). In addition, to receive a cash advance for personal mail, an inmate must meet certain criteria. For example, he may qualify if, like Liner, he lacks sufficient funds for postage and is assigned to a high-security housing unit in which inmates are not permitted to have jobs. (Id., Ex. A ¶ III(A)(2)(a)).

[3] Other authorized items include "Facility Required Items," which every inmate is required to have according to the rules of the facility where he is incarcerated. (Id. ¶ III(F)). It

(See id., Ex. A ¶ III). If the inmate receives new funds, either from payroll receipts (money earned from a job within the prison), or from outside receipts (money received from a source outside prison), DOCCS will take reimbursement for the cash advances from the prisoner's account "as soon as possible, as first priority, from all funds available . . . ." (Id.)

Second, DOCCS may collect funds from an inmate's account to cover "gate money." (Id., Ex. A ¶¶ II, IV(B)(2)(a)). "Gate money" is a one-time, forty-dollar payment that an inmate receives upon his release from DOCCS custody. (See id., Ex. A ¶ IV(B)(2)(a)). Directive 2788 provides that when an inmate is within one year of a potential release, DOCCS will begin collecting 12.5 percent of the inmate's payroll and outside receipts. (Id.). These collections will continue until DOCCS has accumulated forty dollars. (Id.).

Third, Directive 2788 provides that DOCCS may deduct money from an inmate's account to cover the inmate's financial obligations to entities outside the prison. Such collections are known as "manual collections" and take third priority after collections for cash advances and gate money. (See id., Ex. A ¶¶ II, IV(B)(3)). For example, DOCCS may collect money for state court filing fees, restitution, child support payments, court costs, or court-imposed fees such as the crime victim assistance fee and DNA databank fee. (Id., Ex. A ¶ II). Directive 2788 further provides that if the inmate has only one outstanding debt in the "manual collections" category, DOCCS will deduct no more than 20 percent of the inmate's weekly payroll receipts, and no more than 50 percent of each payment from an outside source, to satisfy the encumbrance. (Id., Ex. A ¶ IV(B)(3)(a)). However, if an inmate has two or more debts that are subject to manual collections, DOCCS will collect up to 40 percent of weekly earnings, and

---

also includes "[c]ommissary overbuys resulting from clerical or computer errors . . . ." (Id. ¶ III(D)).

3

up to 100 percent of outside receipts until the inmate's debts have been paid off. (Id., Ex. A ¶ IV(B)(3)(b)). Because Liner is currently incarcerated within a housing unit where prisoners may not have jobs–and thus cannot earn payroll receipts–only the rates for outside receipts are relevant to this motion. (See Fennessy Decl. ¶ 5).

Finally, Directive 2788 governs the rate at which DOCCS will recoup funds to pay federal court filing fees. (Fennessy Decl., Ex. A ¶ IV(B)(3)(d)). It provides that "[w]hen an encumbrance is established for a Federal court filing fee or a court motion/bill of costs, a partial payment will be collected" and then "[t]he remainder of the amount owed will be collected [monthly] at a rate of 20% of all receipts (payroll and outside) . . . ." (Id.). "[O]nly one Federal court filing fee encumbrance and one court motion/bill of costs encumbrance can be active at the same time." (Id.). Consequently, no matter how much money an inmate owes, DOCCS will not collect more than 20 percent of the inmate's funds each month to pay federal court filing fees. This provision is consistent with 28 U.S.C. § 1915(b), which sets the collection rate for federal court filing fees at 20 percent, and with Whitfield v. Scully, 241 F.3d 264, 276-77 (2d Cir. 2001), in which the Second Circuit held that even where a prisoner has debts for multiple sets of federal court filing fees, total collections may not exceed 20 percent, because allowing federal court filing fees to deplete a prisoner's account "arguably could pose a serious constitutional quandary as to whether an unreasonable burden had been placed on the prisoner's right of meaningful access to the courts . . . ."

2. <u>Application of DOCCS Directive 2788 to Liner</u>

Fischer asserts that Liner "[p]resently . . . has 61 encumbrances on his inmate account totaling $1495.95." (Fennessy Decl. ¶ 6).[4] Fischer has also submitted a financial statement from Liner's inmate account for the period ending on January 31, 2013, which indicates that Liner's debts are the result of cash advances for legal photocopies ($40.65), postage ($44.56), and eye glasses ($45.00); and manual collections for federal court filing fees ($702.77), state court filing fees ($65.00), the DNA databank fee ($50.00), disciplinary fines ($97.95), restitution ($20.97), and an unspecified "surcharge" ($321.13). (See id., Ex. B (Inmate Statement)). The financial records submitted by Fischer require some interpretation, and it is not clear from their face whether Liner actually owes as much as $1495.95. However, regardless of the precise amount, it is undisputed that Liner has dozens of encumbrances and that his debt is well over $1300.00. (See id.).

It is further undisputed that, pursuant to Directive 2788, DOCCS has been withdrawing 100 percent of any new funds deposited in Liner's account to satisfy his debts. (See [Plaintiff's] Notice of Motion for Injunction Order, filed January 2, 2013 ("Pl. Collection Mot.") (Dkt. No. 49) ¶ 2; Defendant Fischer's Memorandum of Law in Opposition, filed February 8, 2013 ("Def. Collection Opp.") (Dkt. No. 56), at 6; Fennessy Decl. ¶ 3). In their opposition papers, Defendants assert that they will continue to apply the 100 percent collection rate until Liner has only one encumbrance left, at which time the collection rate will drop to 50 percent. (Def.

---

[4] Defendants assert that $1495.95 is reached by "adding up the 'Total Owed' column for both the 'Advance Breakdown' and the 'Encumbrance Breakdown'" on Liner's account statement. (Fennessy Decl. ¶ 6). It is not clear why Defendants base their calculations on the "total owed" column (which presumably lists the original debt amount) rather than the "balance due" column (which incorporates the amount that Liner has already repaid). When Liner's debt is calculated using the "balance due" column, it amounts to $1388.03.

Collection Opp. at 6; Fennessy Decl. ¶ 3). In making these contentions, Defendants do not appear to account for the special provisions that apply to Liner's federal court filing fees, and which limit the collection rate for federal court fees to 20 percent. See In re Gillard, No. 1:13–MC–0013 (LEK), 2013 WL 474353, at *3 (N.D.N.Y. Feb. 7, 2013) ("The holding in Whitfield is crystal clear that 20 percent of an inmate's income is a 'ceiling' that cannot be overcome by applying the 20 percent on a per case, rather than per prisoner, basis."). Nevertheless, the collection rate for Liner's federal court filing fees may be speculative at this point because, pursuant to Directive 2788, Liner will not begin to pay off his filing fees until he has completed payment (at the 100 percent collection rate) for various cash advances for postage, photocopies, glasses and other items that take higher priority. (See Fennessy Decl., Ex. A ¶ IV(B)).

      3.     Liner's Allegations

Liner argues that the 100 percent collection policy is unconstitutional because it leaves him completely without funds to buy stamps for non-legal mail, skin cream, denture adhesive, deodorant, or shampoo. (Pl. Collection Mot. ¶¶ 1, 2, 4). Liner contends that DOCCS does not provide these items (or does not provide them in adequate amounts) and, without funds, Liner is unable to obtain them. (Id. ¶¶ 2, 3; see also [Plaintiff's] Affidavit in Support of Injunction, filed January 2, 2013 ("Pl. Collection Aff.") (Dkt. No. 49), at ¶¶ 2, 3). Liner also asserts, without providing further detail, that some of his debts are the result of fines imposed through unfair disciplinary procedures. (Plaintiff's Affirmation Reply, filed February 21, 2013 ("Pl. Collection Reply") (Dkt. No. 60), at ¶ 3).

Liner alleges that his inability to afford postage in order to correspond with family and friends violates the First Amendment. (See Pl. Collection Mot. ¶¶ 1, 5). He claims that "[a]t one

point [DOCCS] issued a free stamp a month, [but] this program was deleted [nine] months ago . . . ."(Pl. Collection Aff. ¶ 3; see also Pl. Collection Reply ¶ 9). Liner also claims that he has developed skin lesions and that his hair has been falling out as a result of his inability to buy skin lotion and shampoo. (Pl. Collection Mot. ¶ 4). He contends that his skin ailments prevent him from sleeping and that he has visited the infirmary seeking both skin lotion and shampoo, but the nurses tell him to buy skin cream and shampoo from the prison commissary, which he cannot afford to do. (Id. ¶¶ 2-4). Finally, Liner writes that he is expecting to receive at least 10 percent of a $1100.00 settlement and is concerned that DOCCS will collect all of his settlement proceeds pursuant to the 100 percent collection policy. (See id. ¶ 4).

### B. Liner's Access to Legal Materials

In his second motion for a preliminary injunction, Liner initially alleged that since his transfer to Southport, he had been denied access to law books. ([Plaintiff's] Notice of Motion Preliminary Injunction, filed February 5, 2013 ("Pl. Legal Materials Motion") (Dkt. No. 55)). In a subsequent letter to Court, however, Liner writes that DOCCS has improved his access to law books and he wishes to "remove the injunction in part." Specifically, Liner states that

> DOCS [sic] has [m]ade an attempt to rectify the intrusion [sic]. They ha[ve] not sent the books, however, they have sent the index to . . . me . . . . for the cases. I'm very [o]ptimistic toward the Administration['s] future as upon compliance with law afforded to prisoners in law library.

(Letter from Joshua Liner to the Hon. James L. Cott, dated March 30, 2013 ("Pl. March 30 Letter") (Dkt. No. 65), at 1). Liner adds, however, that he still seeks an injunction for access to the Federal Rules of Civil Procedure because "frequently that Rule Book [s]ent for has not been forwarded." (Pl. March 30 Letter at 2).

In response, Fischer asserts that from January 14, 2013, to February 4, 2013, Liner

7

requested legal materials 11 times and that the only time he was not provided materials was when Southport did not have them. (See Letter from Kevin R. Harkins to the Hon. James L. Cott, dated March 7, 2013 ("Def. Legal Materials Opp.") (Dkt. No. 62), at 1-2). On that occasion, Fischer contends, the library gave Liner a "Master Index" of the materials it did have. (See id. at 2). Fischer's opposition papers do not specifically address whether Liner has requested the Federal Rules of Civil Procedure and, if so, whether the rules were provided.

C.   **Procedural History**

1.   Motion for an Injunction Against the 100 Percent Collection Policy

On January 2, 2013, Liner moved for a preliminary injunction to prevent Defendant Fischer from applying the 100 percent collection policy. (See generally Pl. Collection Mot.) (Dkt. No. 49). On February 8, 2013, Fischer filed opposition papers identifying the 100 percent collection policy as DOCCS Directive 2788 (Defendant Fischer's Memorandum of Law in Opposition, dated February 8, 2013 ("Def. Collection Mem.") (Dkt. No. 56), at 5; Fennessy Decl. ¶¶ 3-5 & Ex. A), and denying that the policy prevents Liner from obtaining stamps or skin lotion. (See Declaration of Nurse Practitioner John VonHagn filed February 8, 2013 ("VonHagn Decl.") (Dkt. No. 57), at ¶¶ 3-5 (listing 60 occasions when Plaintiff received cream, lotion, or ointment and noting stronger skin lotion prescription issued in January 2013); Fennessy Decl. ¶¶ 7-8 (stating Liner is currently eligible to receive a cash advance for one stamp per month for personal mail pursuant to DOCCS Directive 2788).

On February 21, 2013, Liner filed reply papers, alleging that when DOCCS officials became aware that Liner was going to receive a financial settlement, "they went on a[n] ongoing vendetta writing bogus tickets charging such to my account over one hundred dollars in bogus tickets." (Pl. Collection Reply ¶ 3). Liner also disputes Fischer's assertions that DOCCS

8

provides adequate skin cream and one postage stamp per month for personal mail. (See id. ¶¶ 7, 9). Rather, Liner contends that the one-stamp-per-month policy for personal mail has not been in effect for nearly 15 months. (See id. ¶ 9).

On March 12, 2013, Liner submitted an additional letter stating that "[t]he defendant's move to actuate withdrawal of all funds of $1100.00 dollars before this Court made a decision warrant sanctions as stated in the injunction." (Letter from Joshua Liner to the Hon. James L. Cott, dated March 4, 2013 ("Pl. March 4 Letter") (Dkt. No. 63), at 1).

### 2. Motion for an Injunction to Ensure Access to Legal Materials

On February 5, 2013, Liner filed a second motion for a preliminary injunction, alleging that he was being unconstitutionally denied access to law books and legal materials. (See generally Pl. Legal Materials Motion) (Dkt. No. 55). On March 7, 2013, Fischer submitted opposition papers (Def. Legal Materials Opp.) (Dkt. No. 62), arguing that Liner has had access to law books. (See id. at 1-2). Liner then submitted reply papers asserting that while his access to law books has improved, he still seeks an injunction for access to the Federal Rules of Civil Procedure. (See Pl. March 30 Letter at 1-2).

## II. DISCUSSION

### A. Standard of Review

"A party seeking a preliminary injunction ordinarily must show: (1) a likelihood of irreparable harm in the absence of the injunction; and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor." Doninger v. Niehoff, 527 F.3d 41, 47 (2d Cir. 2008) (citing Sunward Elecs., Inc. v. McDonald, 362 F. 3d 17, 24 (2d Cir. 2004)). "When the movant seeks a 'mandatory' injunction–that is, as in this case, an

injunction that will alter rather than maintain the status quo–[]he must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." Id.

A finding of "irreparable harm" requires "an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 37 (2d Cir. 1995) (citation and quotation marks omitted). "[T]he mere possibility of harm is not sufficient to warrant the drastic imposition of a preliminary injunction." REDF Organic Recovery, LLC v. Kafin, No. 12 Civ. 7973 (JFK), 2012 WL 5844191, at *2 (S.D.N.Y. Nov. 19, 2012). Violation of a constitutional right is considered "irreparable harm." Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir. 1996); see also Charette v. Town of Oyster Bay, 159 F.3d 749, 755 (2d Cir. 1998) ("In the context of a motion for a preliminary injunction, violations of First Amendment rights are commonly considered irreparable injuries.") (citation and internal quotation marks omitted).

In determining whether a plaintiff is likely to succeed on the merits, "a court must analyze the claims the plaintiff made and the facts asserted in the complaint, not the claims made or facts asserted, for the first time, on the motion for a preliminary injunction." ZeptoLab UK Ltd. v. Commonwealth Toy & Novelty Co., Inc., No. 12 Civ. 2044 (TPG) (KNF), 2012 WL 4761501, at *7 (S.D.N.Y. Aug. 23, 2012) (Report and Recommendation). This is because "[t]he purpose of interim equitable relief is to protect the movant, during the pendency of the action, from being harmed or further harmed in the manner in which the movant contends [he] was or will be harmed through the illegality alleged in the complaint." Omega World Travel, Inc. v. Trans World Airlines, 111 F.3d 14, 16 (4th Cir. 1997). Thus, "'a party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint.'" Grullon v. Reid, No. 97 Civ. 7616 (RWS),

2000 WL 648891, at *1 n.1 (S.D.N.Y. May 19, 2000) (quoting Devose v. Herrington, 42 F.3d 470, 471 (8th Cir. 1994)); see also Colvin v. Caruso, 605 F.3d 282, 300 (6th Cir. 2010) (same).

### B. Liner's Application to Enjoin the Collection Policy Should Be Denied

#### 1. Lack of Access to Postage

Liner alleges that his First Amendment rights are being violated because, due to the 100 percent collection policy, he cannot afford stamps for personal mail. He further asserts that DOCCS will not give him stamps for personal mail, and that the "1# [p]ostage [stamp] allowance a [m]onth" is inadequate, leaving him unable to contact family and friends. (Pl. Collection Reply at ¶ 9). In response, Fischer argues that Liner's claim is factually inaccurate, and that Liner may receive a cash advance from DOCCS for one postage stamp per month for personal mail pursuant to Directive 2788 ¶ III (A)(2)(a).[5]

"Under the First Amendment, prisoners have a right to 'the free flow of incoming and outgoing mail.'" Johnson v. Goord, 445 F.3d 532, 534 (2d Cir. 2006) (quoting Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003)). "'In balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail.'" Id. When assessing restrictions on postage for personal mail, the Second Circuit has applied the factors set forth in Turner v. Safley, 482 U.S. 78, 89 (1987). Namely, a court must consider (1) whether the restriction on postage is reasonably related to a valid

---

[5] Fischer submits Liner's January 2013 account statement as evidence that Liner receives cash advances for postage. (Fennessy Decl., Ex. B). However, while it is true Liner's account statement shows that he has received multiple cash advances for postage in 2013, it does not indicate definitively whether the advances were for legal or personal mail. (See Fennessy Decl., Ex. B at 1-2) (showing, inter alia, that Liner received cash advances for postage on January 3 ($0.40); January 4 ($3.40), and twice on January 11 ($1.45 and $1.90), without specifying whether advances were for legal or personal mail)).

11

penological purpose; (2) whether there are alternative ways for prisoners to exercise their First Amendment rights to send personal mail; (3) the potential impact that accommodations would have on the prison, its staff, and prison resources; and (4) how the challenged regulation compares to proposed alternatives. Johnson, 445 F.3d at 535; see also Davidson v. Mann, 129 F.3d 700, 702 (2d Cir. 1997) (applying Turner and upholding limitation on number of stamps that prisoners were permitted to purchase for personal mail each month).

Applying the Turner framework, the Second Circuit has specifically upheld a prison policy wherein prisoners were given one stamp per month for personal mail. See Johnson, 445 F.3d at 534-35. In Johnson, the plaintiff challenged a policy which provided that, for security reasons, certain inmates would not be allowed to receive postage stamps in the mail, but would be limited to either (1) stamps purchased from the commissary; or (2) one free postage stamp per month, as provided by the prison. The plaintiff asserted that he could not afford to buy stamps from the commissary, and argued that receiving only one stamp per month violated his First and Fourteenth Amendment rights. The Second Circuit disagreed, finding that the restrictions on buying stamps were related to valid penological goals and, in addition, that "an indigent prisoner does not have a constitutional right to unlimited free postage for non-legal mail." Id. at 534. Other circuits have similarly found that the First Amendment right to send and receive personal mail does not create an entitlement to postage for indigent prisoners. See, e.g., Moore v. Chavez, 36 Fed. App'x. 169, 171 (6th Cir. 2002); Van Poyck v. Singletary, 106 F.3d 1558, 1559-60 (11th Cir. 1997); Hershberger v. Scaletta, 33 F.3d 955, 957 (8th Cir. 1994).

In light of Johnson, Liner is unlikely to prevail on the merits of his First Amendment challenge to Directive 2788. Although Liner also contends that DOCCS has not been following Directive 2788, and has failed to provide even one stamp per month for personal mail, Liner has

not presented evidence to support this claim, nor does he address the evidence submitted by Defendants. Moreover, the provisions in Directive 2788 providing for one stamp per month do not, in and of themselves, create a constitutional entitlement to postage. See Roston v. Selsky, No. 00 Civ. 8994 (HB), 2001 WL 1297797, at *2 (S.D.N.Y. Oct. 25, 2001) ("'a state employee's failure to conform to state law does not in itself violate the Constitution'") (quoting Patterson v. Coughlin, 761 F.2d 886, 891 (2d Cir. 1985)); Dawes v. Carpenter, 899 F. Supp. 892, 899 (N.D.N.Y. 1995) (finding that where Department of Correctional Services had discretion to give indigent prisoner a monthly postage stamp pursuant to State law, prisoner did not have constitutional entitlement to stamp). Because Liner has not met his burden of establishing a likelihood of success on the merits, his claim with regard to access to postage stamps for personal mail does not provide a basis for a preliminary injunction.

### 2. Lack of Access to Skin Lotion

Liner is similarly unable to establish a likelihood of success in his Eighth Amendment claim as it relates to the collection policy. "[T]o establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle v. Gamble, 492 U.S. 97, 104 (1976)). A cognizable claim of deliberate indifference consists of (1) an objective "medical need" element based on the severity of the alleged deprivation, and (2) a subjective "deliberate indifference" element based on whether the prison official acted with a sufficiently culpable state of mind. Smith v. Carpenter, 316 F.3d 178, 183-84 (2d Cir. 2003). Fischer has provided substantial evidence that Liner frequently receives various skin creams, lotions, and ointments. Fischer has also presented evidence that, while Liner has "issues of dry skin," he does not have "skin lesions," as he alleges. (See VonHagn Decl. ¶ 3). Moreover, Liner

does not allege facts showing that any Defendant had a culpable state of mind when Plaintiff was unable to buy skin lotion, denture products, or shampoo. Thus, his claim with regard to access to skin lotion does not provide a basis for a preliminary injunction either.

### 3. Collection of Liner's Funds to Satisfy Federal Court Filing Fees

Construing Liner's <u>pro se</u> filings liberally, I also examine whether Liner is entitled to a preliminary injunction because DOCCS may deduct too high a percentage of his funds for federal court filing fees, in violation of 28 U.S.C. § 1915(b) and the Second Circuit's holding in <u>Whitfield</u>, 241 F.3d at 276-77.

Liner asserts that he expects to receive a financial settlement, and that he is concerned that DOCCS will withdraw all of the settlement proceeds pursuant to the 100 percent collection policy. In his motion papers, Liner suggests that he will likely receive $110.00 in settlement funds (10 percent of the total settlement amount of $1100.00). (<u>See</u> Pl. Collection Mot. ¶ 4). In a subsequent letter, Liner asserts that he may receive as much as $1100.00. (Pl. March 4 Letter at 1). If Liner does, in fact, receive $1100.00 in settlement proceeds, DOCCS may not be entitled to deduct all $1100.00 to repay Liner's debts. According to my calculations, based on the January 2013 financial records submitted to the Court, Liner owes $1388.03, of which $702.77 is attributable to federal court filing fees, and $685.26 arises from other types of debts. Under the holding in <u>Whitfield</u>, 241 F.3d at 276-77, DOCCS would be limited to a deduction of 20 percent, or $220.00, of the settlement proceeds in order to pay the federal court filing fees. Thus, DOCCS's total deduction would be $905.26, consisting of $220.00 to be used towards federal court filing fees and $685.26 to pay off the other debts. This would presumably leave

Liner with nearly two hundred dollars in his account.[6]

Neither party addresses the 20 percent collection rate for federal court filing fees in their papers. Moreover, it is not clear from the record whether Liner has received or will receive $1100.00 in settlement proceeds, or whether DOCCS will seek (erroneously) to deduct all of Liner's funds to repay his debts. However, even assuming that Liner receives $1100.00 and that DOCCS deducts too much money from Liner's account, Liner is unable to establish irreparable harm for which a "monetary award cannot be adequate compensation." Tom Doherty Assocs., Inc., 60 F.3d at 37. On the contrary, repayment is the appropriate remedy where DOCCS fails to apply the 20 percent collection rate for federal court filing fees. See, e.g., In re Gillard, 2013 WL 474353, at *3 (ordering DOCCS to repay prisoner for funds that were erroneously deducted for federal court filing fees). Accordingly, I do not find a basis to recommend that a preliminary injunction be issued with regard to DOCCS' potential collection of Liner's settlement proceeds.

### C. Liner's Application for an Injunction to Ensure Access to Legal Materials Should Also Be Denied

In his second motion for an injunction, Liner asserts that he has been denied adequate access to law books at Southport Correctional Facility. Southport is a high security prison where prisoners do not have direct access to the law library. (Def. Legal Materials Opp. at 1). Instead, prisoners must submit request slips to have legal materials sent to their cells. (Id.). Liner alleges that when he writes out requests for legal materials, the prison does not adequately respond to his requests. In particular, Liner asserts that he does not have adequate access to the Federal Rules of Civil Procedure and that "frequently that Rule Book [s]ent for has not been forwarded." (Pl.

---

[6] If DOCCS deducts $905.26 from the $1100.00 in settlement proceeds, Liner will have $194.74 remaining.

15

March 30 Letter at 2).

It is well-settled that "[p]risoners have a right to meaningful access to the courts," Melendez v. Hasse, No. 04 Civ. 73 (PKC), 2010 WL 5248627, at *7 (S.D.N.Y. Dec. 15, 2010) (citing Bounds v. Smith, 430 U.S. 817, 828 (1977)), which "gives rise to a number of derivative rights, including the right to access legal materials to prepare a case . . ." Id. (quoting Collins v. Goord, 581 F. Supp. 2d 563, 573 (S.D.N.Y. 2008)). In order to challenge the denial of access to legal materials, a party must have an "actual injury" deriving from the alleged lack of access; "that is, actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim." Lewis v. Casey, 518 U.S. 343, 348 (1996) (internal quotation marks and citation omitted).

Here, Liner does not contend that he suffered a specific injury resulting from the alleged denial of access to law books. In addition, Liner has not provided any details regarding his requests for law books, or when his requests have been granted or denied. Defendant Fischer, on the other hand, has submitted ample evidence to show that Plaintiff's requests for law books have generally been fulfilled. Based on the record before the Court, Liner cannot meet the "actual injury" requirement of Lewis, 518 U.S. at 348, in order to prevail on the merits of his claim.[7]

### III. CONCLUSION

For the foregoing reasons, I recommend that Liner's motions for injunctive relief (Dkt. Nos. 49 and 55) be denied.

---

[7] I also note that Liner raises this claim for the first time in his motion for injunctive relief, not in the Amended Complaint. For that reason alone, the Court could find that Plaintiff is unlikely to be successful on the merits of his claim as it relates to this motion. See ZeptoLab UK Ltd., 2012 WL 4761501, at *7.

16

## PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty and the undersigned, United States Courthouse, 500 Pearl Street, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Crotty. **FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. *See Thomas v. Arn*, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010). If Liner does not have access to cases cited herein that are reported on Westlaw, he should request copies from Defendants. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

Dated:  New York, New York
        May 1, 2013

JAMES L. COTT
United States Magistrate Judge

**A copy of this Report and Recommendation has been sent to the following:**

Joshua Liner
DIN #04-A-4086
Southport Correctional Facility
236 Bob Masia Drive
P.O. Box 2000
Pine City, New York 14871-2000