USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/24/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JOSHUA LINER,                              :
                                           :       **REPORT AND RECOMMENDATION**
                                           :
                          Plaintiff,       :       11 Civ. 6711 (PAC) (JLC)
            -v.-                            :
                                           :
BRIAN FISCHER, et al.,                     :
                                           :
                          Defendants.      :
-------------------------------------------------------------x

**JAMES L. COTT, United States Magistrate Judge.**

**To The Honorable Paul A. Crotty, United States District Judge:**

Plaintiff Joshua Liner, a prisoner at Southport Correctional Facility in Pine City, New

York, has brought this action pursuant to 42 U.S.C. § 1983 alleging violations of his

constitutional rights at several prisons where he has been incarcerated.[1]  Proceeding pro se, Liner

has sued Brian Fischer, Commissioner of the New York State Department of Corrections and

Community Supervision ("DOCCS"); Carl J. Koenigsmann, Chief Medical Officer for DOCCS;

Ada Perez, Superintendent of Downstate Correctional Facility; and Lawrence Wilcox, a nurse

practitioner at Lakeview Shock Incarceration Correctional Facility.

In his Amended Complaint, Liner alleges a myriad of claims: he was denied adequate

medication for glaucoma; he was denied adequate foot cream and skin lotion; he was denied a

bottom-bunk permit; treatment for his back pain was inadequate; guards at Gowanda, Great

Meadow, and Wyoming Correctional Facilities deprived him of food; his legal mail and other

property were lost, damaged, and destroyed by guards; a guard at Gowanda Correctional Facility

---

[1] Liner was incarcerated at Wende Correctional Facility ("Wende") at the time the
motion addressed herein was filed.  He has since been transferred to Southport Corrrectional
Facility ("Southport").  Liner is reminded to advise the Court of all address changes.

USDC SDNY
DATE SCANNED  6/24/13

threatened to urinate on his property unless Liner signed an "I-64" form; he was denied due

process at two disciplinary hearings in 2011 as well as in a 2007 appeal of a disciplinary

determination; and a DOCCS policy regarding inmate funds has left him without enough money

in his account to buy postage stamps or other items from the prison commissary.  In addition,

Liner contends that he should be granted injunctive relief to (1) require that DOCCS provide him

with adequate glaucoma medication; (2) prevent him from being assigned to a top bunk;

(3) require that DOCCS give him medical records arising from his visits to an eye specialist; and

(4) lift any disciplinary sanctions against him and remove them from his record.

Defendants have moved to dismiss the Amended Complaint in its entirety pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons that follow, I recommend

that the motion to dismiss be granted, except as to Liner's deliberate indifference claims against

Wilcox pertaining to his glaucoma treatment and chronic back pain, as to which the motion

should be denied.

## I.   BACKGROUND

### A.   Liner's Allegations

The following facts are taken from the Amended Complaint that Liner filed on April 23,

2012 ("Am. Compl.") (Dkt. No. 19), as well as from Liner's "Affidavit in Opposition to

Defendants' Pledge" Pursuant to Fed. R. Civ. P. 12(b)(6), filed January 15, 2013 ("Pl. Opp.")

(Dkt. No. 51).[2]

---

[2] Defendants argue that the Court should not consider any factual allegations raised for
the first time in Liner's opposition papers.  (Defendants' Reply Memorandum of Law in Further
Support of Their Motion to Dismiss, dated February 8, 2013 ("Def. Reply"), at 5 (Dkt. No. 59)).
However, the Second Circuit recently reaffirmed that "[a] district court deciding a motion to
dismiss may consider factual allegations made by a pro se party in his papers opposing the
motion."  Walker v. Schult, No. 12-1806-CV, 2013 WL 2249159, at *2 n.1 (2d Cir. May 23,

1.   Liner's Medical Claims

   a.   Glaucoma Medication

Liner, who is 54 years old, alleges that he has suffered from glaucoma since 2006. (Am. Compl. at 10).[3]  He asserts that an "eye specialist" has prescribed him "three bottles" of eye medication, but that from late 2010 until December 14, 2012, he received only two. (Id. at 10, 13; Pl. Opp. at 2-3, 6, 8).  Liner also contends that he was denied eye medication altogether when he was temporarily transferred to Downstate Correctional Facility ("Downstate") to attend court proceedings on four different occasions in 2011 and 2012. (Am. Compl. at 1, 5, 20; Pl. Opp. at 3).[4]  Liner asserts that the denial of medication has caused "eye pain," "headaches," "blur [sic] vision," and a general deterioration of his vision such that he "could go blind." (Am. Compl. at 10, 20).

Liner brings specific claims against all four defendants with regard to the alleged denial of glaucoma medication.  He contends that "Wilcox was personally advised on several interviews at the Lakeview Correctional Facility ("Lakeview"), that prescribed medication . . . [was] missing," but Wilcox refused to provide the missing medication. (Pl. Opp. at 2).

---

2013) (citing Gill v. Mooney, 824 F.2d 192, 195 (2d Cir. 1987)).  In addition, in assessing a motion to dismiss, the court may rely upon "documents attached to the complaint as exhibits[] and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citations omitted).

   [3] The 22-page Amended Complaint consists of (1) two introductory pages, which are not numbered; (2) an amended complaint form, with sequentially numbered pages from 3 to 9; (3) additional pages, numbered sequentially from 1 to 12; and (4) a signature page, which is not numbered.  Consequently, for ease of reference, citations to the Amended Complaint refer to the ECF page number.

   [4] Liner asserts that he was he was denied his glaucoma medication while at Downstate on the following dates: March 4-6, 2011 (Am. Compl. at 20), July 30-31, 2011 (id.), March 23-27, 2012 (id. at 1), and August 18-20, 2012 (Pl. Opp. at 3).

According to Liner, Wilcox and other nurses said that Liner was being denied medication due to "'budget cuts'" that were "coming . . . out of Albany" and because "they do not believe the other bottle to[] be [n]ecessary." (Id.).[5]  Liner seeks damages of $750,000.00 from Wilcox.  (See Am. Compl. at 17).  He also seeks an injunction directing Wilcox to provide Liner with all three bottles of glaucoma medication, and a "restraining order compelling [Wilcox] to turn over all medical orders written by the eye specialist in [Wilcox's] immediate (possession) or control." (Id.).

As to Koenigsmann, Liner contends that he ordered the "exclusion of eye drop medication for treatment of glaucoma" (id. at 18); and conspired with Wilcox "to deny Plaintiff his glaucoma medication prescribed by medical eye specialist [sic]." (Id.).  Liner seeks $750,000.00 in damages from Koenigsmann and an injunction compelling him to provide Liner with sufficient glaucoma medication.  (See id. at 19).

As to Fischer, Liner contends that he acted with deliberate indifference to Liner's medical needs because he allegedly refused to address Liner's many grievances and complaints regarding glaucoma treatment.  (See id. at 13).  Liner seeks $750,000 in damages from Fischer. (See id. at 7).

Finally, as to Perez, Liner asserts that she was responsible for the denial of glaucoma medication at Downstate.  Liner contends that Perez (1) acted with deliberate indifference by failing to ensure that Liner received his glaucoma medication while at Downstate (id. at 20); (2) poorly supervised staff with respect to the distribution of Liner's medication when he was

---

[5] It is not clear from Liner's opposition papers whether he is alleging that Wilcox said that he personally did not believe additional medication was necessary, or whether "people in Albany" did not think it was necessary.  (See Pl. Opp. at 2).

4

transferred to Downstate (see id.); (3) had "a policy protocol to convert dispenser of required

medics from Albany DOCS Commissioner adoption," [sic] which constituted "deliberate

indifference" (id.); (4) conspired with Fischer to deny Liner his medication (id.); and (5) was

grossly negligent in failing to address Liner's lack of medication despite Liner's grievances and

complaints to Fischer and the Governor of New York (see id. at 21).  Liner seeks damages of

$750,000.00 from Perez.  (Id.).

     In addition to his communication with Wilcox, described above, Liner generally alleges

that "[t]he Central grievance process, and the magnitude of letters, grievances over . . . two years

gave each defendant ample awareness of their illicit behavior." (Pl. Opp. at 5).  He further

asserts that, "where grievances also complaints to chief officer fail to prevail, the situation is

obviously a custom" (id. at 14), and he suggests that it is implausible that "in almost an [sic] two

year period they knew nothing of the deprivation of the glaucoma [medication] . . . ." (Id. at 13).

As exhibits to his opposition papers, Liner attaches copies of his grievances and the institutional

responses from when he was incarcerated at Lakeview (id., Exs. A, A1, A3, A4, C1), Gowanda

(id., Ex. A2), Wyoming (id., Ex. B6), Elmira (id., Exs. B7, E2), and Upstate Correctional

Facilities (id., Ex. C2).  Liner also includes a May 15, 2010 letter to Fischer complaining about a

female nurse at the Wyoming Correctional Facility ("Wyoming") who, on May 13 and 14, 2010,

failed to treat his "jock itch" and his eye, head, and foot pain.  (See id., Ex. A5).  Liner asserts

that he has filed many other grievances and complaints that are not in the record, including

complaints addressed to Fischer, Koenigsmann, and Perez.  (See id. at 3).[6]

_____

     [6] In many of the responses to his grievances, corrections officials disputed Liner's need
for various medical treatments, advised him to seek further treatment via sick call, and informed
him that medical professionals within the prisons are not required to follow recommendations of
outside medical specialists.  See, e.g., id., Ex. A (Lakeview superintendent stated on May 11,

b.     Skin Conditions

Liner contends that he has dry, itchy skin requiring lotion.  (See Am. Compl. at 16).  He also asserts that he has an unspecified foot condition that requires medicated foot cream.  (See id.; Pl. Opp. at 3).  In describing his foot condition, Liner alleges that he has "chronic feet pain and chafing [sic], which turn into cuts when not treated."  (Pl. Opp. at 3).

Liner alleges that Wilcox has been deliberately indifferent to his medical needs by providing an "inadequate dosage of feet creme medication," and by advising Liner that in order to obtain skin lotion, he must buy it from the prison commissary, which Liner cannot afford to do.  (Am. Compl. at 16).  Liner also asserts that Wilcox has acted with gross negligence by refusing to examine Liner's skin conditions.  (Id.).  In addition, Liner brings a retaliation claim against Wilcox, asserting that "[w]hen Wilcox was informed by me of the court proceeding[,] he stopped my medicated foot creme order."  (Pl. Opp. at 3).

As to Koenigsmann, Liner contends that he has acted with gross negligence towards Liner's medical needs by failing to supervise medical staff, failing to maintain medical records, and allowing staff to withhold medical treatment "as punishment."  (Am. Compl. at 18).

---

2012, "Outside specialists may only make recommendations for treatment; however, the implementation of those recommendations is at the discretion of the FHSD [Facility Health Services Directors], based on their professional judgment.  As the healthcare providers at Lakeview have deemed your request for eye drops "not appropriate" for your current treatment, this grievance has no merit."); id., Ex. A1 (Inmate Grievance Resolution Committee (IGRC) at Lakeview stated on June 14, 2012, "grievant was seen by the eye specialist on 6/1/12 . . . .  The grievant has no indication for the need for 'no more tears' for his eyes.  The grievant may request request OTC Motrin or Tylenol from the nurse to relieve his eye pain.  The grievant had a MRI completed on his back 3 years ago.  There is no need for an additional MRI at this time.  Five years is the typical time frame to repeat medical tests.").

c.   Request for a Bottom Bunk

Liner alleges that he has chronic back pain, a leg injury, and bladder problems, and therefore requires a bottom bunk. (See id. at 1, 19; Pl. Opp. at 4.) Liner contends that Wilcox delayed evaluating him for a bottom bunk permit for more than two months in retaliation for Liner having filed various other grievances. (See Am. Compl. at 16). He also alleges that when Wilcox finally performed the evaluation on April 9, 2012, Wilcox did not review Liner's records properly, and thus Wilcox did not see that a nurse practitioner had previously determined that Liner should have a bottom bunk permit. (Id.).

Liner also contends that Fischer and Koenigsmann have acted with deliberate indifference to his medical needs by enforcing a policy that led to Liner having a top bunk despite his back, leg, and bladder problems. (Pl. Opp. at 4). Liner requests that an injunction be issued against Koenigsmann and Fischer to direct that Liner be assigned a bottom bunk. (Am. Compl. at 15, 19).

d.   Back Problems

Liner contends that he has "permanent back damage[]" due to injuries "from an amusement park ride ([a]t Great Adventure)" and "being hit by a car." (Pl. Opp. at 5). He alleges that treatment for his back has been inadequate (Am. Compl. at 1, 19); specifically, the "pills prescribed" for his chronic back pain are insufficient (id. at 19), and "'[o]rthopedic' referrals hav[e] been ignored." (Pl. Opp. at 5). Liner also asserts that he has not been permitted to wear his back brace or leg brace on trips to court (Am. Compl. at 1), and contends that "they took my back brace." (Id. at 19). Liner is not entirely clear as to which defendant he wishes to

sue with regard to his back pain, but he asserts that defendant Wilcox "was notified on three different occasions" of Liner's back problems. (See Am. Compl. at 19).[7]

### 2.   Deprivation of Food

Liner contends that he was denied food by guards at three different State prisons, each of which was "[o]perated by [d]efendant Brian Fischer." (Am. Compl. at 14). He alleges that while incarcerated at Gowanda Correctional Facility ("Gowanda"), unidentified guards took his food for more than a month. (Id.). While at Wyoming, Liner asserts that a correction officer named "M. Anderson," who is not a named defendant, "was eating all my trays teasing me at the door." (Id.). At Great Meadow Correctional Facility ("Great Meadow"), Liner contends he was "denied . . . meals for over a month." (Id.). Liner does not provide additional information as to when these incidents occurred or who was involved. He asserts that complaints and reports were filed at various State prisons and that Fischer was notified of "each occurrence." (Id.).

### 3.   Destruction of Property and Legal Mail

Liner alleges that his mail and legal papers have been lost, damaged, or destroyed on multiple occasions at various facilities. He contends that Fischer failed to supervise employees and/or was grossly negligent when the following occurred: (1) Liner's property got wet and some property was lost while in transit from Gowanda to Orleans Correctional Facility ("Orleans") (see id. at 12); (2) Liner's legal papers and an "entire hold bag" went missing from Elmira Correctional Facility ("Elmira") (id. at 12); (3) Liner's legal paperwork, including a complaint, was "intercepted by DOCS" when he tried to send it to the court from Upstate Correctional Facility ("Upstate") on March 15, 2010, and a second complaint was damaged at

---

[7] Liner is now incarcerated at Southport, and the record does not indicate whether he is still being denied a bottom-bunk permit or a back brace (and Liner has not alleged as much).

Upstate on May 29, 2011 (id. at 11; see also id. at 14-15; Pl. Opp. at 10); and (4) a Gowanda

correction officer threatened to urinate on Liner's property unless Liner signed an "I-64" form,

and the property was "dingy soaked with water, or whatever" when Liner finally received it.

(Am. Compl. at 12; see also id. at 15).[8]

        4.     Due Process at Disciplinary Proceedings

Liner asserts that Fischer has violated his due process rights in the course of various

disciplinary proceedings.  Liner contends that: (1) he was not allowed to present witnesses or

receive assistance in his defense at a disciplinary hearing on May 19, 2011, which resulted in his

receiving six months in punitive segregation in the Special Housing Unit ("SHU") (Am. Compl.

at 13; see also Pl. Opp. at 9); (2) a hearing officer was biased against Liner and made a decision

based on "non substantial evidence" at a hearing on August 11, 2011 (Am. Compl. at 14); and

(3) Fischer improperly affirmed a disciplinary ruling against Liner on March 26, 2007 for an

infraction he committed while at Great Meadow.  (See Am. Compl. at 5; Pl. Opp., Exs. D1, D2).

Liner seeks $750,000.00 in damages from Fischer (see Am. Compl. at 7), as well as a "[]TRO[]

and [i]njunctive [r]elief" to discontinue any disciplinary sanctions against Liner and remove all

sanctions from Liner's record "until suitable evaluation from independent clause [sic] makes it's

[sic] determination." (Id. at 15).

        5.     The 100% Collection Policy Pursuant to DOCCS Directive 2788

As discussed in my Report and Recommendation filed May 2, 2013 ("May 2, 2013

Report & Recommendation") (Dkt. No. 66), Liner also objects to DOCCS Directive 2788, which

---

[8] In his Opposition, Liner makes additional allegations with regard to his legal mail, but does not connect them to any particular defendant; namely, he alleges that his legal mail was opened after he was accused of having a shank in his cell (Pl. Opp. at 12), and that his papers got wet on November 29, 2012.  (Id. at 11-12).

provides that under certain circumstances, DOCCS may seize up to 100 percent of any new funds deposited in an inmate's prison account in order to satisfy the inmate's debts. (See Am. Compl. at 2). Liner contends that the policy is unconstitutional because it prevents him from having sufficient funds in his account to buy postage stamps for personal mail, and he is in a secure housing unit where he does not have phone privileges. (Id.). Liner also states that DOCCS' provision of "1# [s]tamp a [m]onth [for personal mail] is entirely inadequate." (Id.).[9]

### B.   Procedural History

1.   Prior Motions

The Court has considered three prior motions in this case. On April 19, 2012, Defendants moved to have the Court revoke Liner's in forma pauperis ("IFP") status, arguing that he had accumulated more than three "strikes" – i.e., prior actions that were dismissed as frivolous, malicious, or for failure to state a claim – and therefore was barred, under 28 U.S.C. § 1915(g), from filing new actions IFP. (Defendants' Memorandum of Law in Support of Defendants' Motion to Have Plaintiff's IFP Status Revoked) (Dkt. No. 16). On October 12, 2012, the Court adopted the July 11, 2012 Report & Recommendation that Defendants' motion to revoke Liner's IFP status be denied, without prejudice to renewal if discovery revealed that Liner was not in imminent danger of serious physical injury. See Liner v. Fischer, No. 11 Civ. 6711 (PAC) (JLC), 2012 WL 2847910, at *4 (S.D.N.Y. July 11, 2012) (Report and Recommendation) ("July 11, 2012 Report and Recommendation"), adopted, 2012 WL 4849130, at *3 (S.D.N.Y. Oct. 12, 2012).

---

[9] On January 2, 2013, eight months after filing the Amended Complaint, Liner filed motion papers in which he alleged, for the first time, that DOCCS had stopped providing any stamps for personal mail nine months earlier. ([Plaintiff's] Affidavit in Support of Injunction ("Pl. Collection Aff.") (Dkt. No. 49), at ¶ 3).

On January 2, 2013, Liner moved for a preliminary injunction to declare unconstitutional DOCCS Directive 2788, which provides that DOCCS may satisfy encumbrances on Liner's inmate account by collecting and withholding any money sent to Liner from sources outside of prison.  (See [Plaintiff's] Notice of Motion for Injunction Order ("Pl. Collection Mot.") (Dkt. No. 49)).  On February 5, 2013, Liner filed a second motion for a preliminary injunction, in which he alleged that since his transfer to Southport Correctional Facility, he has not had adequate access to requested law books.  ([Plaintiff's] Notice of Motion Preliminary Injunction ("Pl. Legal Materials Motion") (Dkt. No. 55)).  In the May 2, 2013 Report and Recommendation, I recommended that both motions for preliminary injunction be denied.  (Dkt. No. 66).

### 2.    The Pending Motion

In motion papers dated December 20, 2012, Defendants moved to dismiss Liner's amended complaint in its entirety, on the grounds that (1) Liner cannot maintain claims against Fischer, Koenigsmann, and Perez based on supervisory liability; (2) Liner has failed to state a claim for deliberate indifference against any defendant; (3) Liner has failed to state a claim for conspiracy; and (4) some of Liner's claims are untimely.  (See Defendants' Memorandum of Law in Support of their Motion to Dismiss ("Def. Mem."), at 1-2 (Dkt. No. 47)).[10]  Liner filed

---

[10] Defendants have not moved to dismiss any of Liner's claims on the ground that he has failed to exhaust his administrative remedies, as he is required to have done under the Prison Litigation Reform Act ("PLRA").  See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under [Section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").  While exhaustion under Section 1997e(a) is mandatory, see Porter v. Nussle, 534 U.S. 516, 524 (2002), non-exhaustion "is an affirmative defense that is waiveable." Handberry v. Thompson, 446 F.3d 335, 342 (2d Cir. 2006) (citations, alterations, and quotation marks omitted); see also Jones v. Bock, 549 U.S. 199, 216 (2007); Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004).  Here, because Defendants have not argued that

opposition papers on January 15, 2013 (see Pl. Opp. (Dkt. No. 51)).  Defendants' Reply

Memorandum of Law in Further Support of their Motion to Dismiss ("Def. Reply") was filed on

February 8, 2013.  (Dkt. No. 59).

## II.   DISCUSSION

### A.   Applicable Legal Standards

#### 1.   Motion to Dismiss

Defendants have moved to dismiss Liner's amended complaint for "failure to state a

claim upon which relief can be granted" pursuant to Fed. R. Civ. P. 12(b)(6).  In considering a

12(b)(6) motion, a court accepts all well-pleaded allegations in the complaint as true and draws

all reasonable inferences in the plaintiff's favor.  See, e.g., Pension Comm. of Univ. of Montreal

Pension Plan v. Banc of Am. Sec. LLC, 568 F.3d 374, 381 (2d Cir. 2009).  "To survive a motion

to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell

Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citation omitted).  Mere

"labels and conclusions" or a "formulaic recitation of the elements of a cause of action" are not

enough to survive a motion to dismiss.  Twombly, 550 U.S. at 555.

---

Liner failed to exhaust his administrative remedies, the non-exhaustion defense has been waived.
See, e.g., Ortiz v. Dep't of Corr. of the City of N.Y., No. 08 Civ. 2195 (RJS) (HBP), 2011 WL
2638137, at *4 (S.D.N.Y. Apr. 29, 2011) (defendant's failure to raise non-exhaustion constitutes
waiver) (Report and Recommendation), adopted, 2011 WL 2638140 (S.D.N.Y. July 5, 2011);
Hobson v. Fischer, No. 10 Civ. 5512 (SAS), 2011 WL 891314, at *2 n. 22 (S.D.N.Y. Mar. 14,
2011) (finding waiver even where grievance "appears not to have been fully exhausted" under
PLRA).

12

Complaints prepared by pro se litigants are held "to less stringent standards than formal pleadings drafted by lawyers." Peay v. Ajello, 470 F.3d 65, 67 (2d Cir. 2006) (citations and quotation marks omitted). "Where, as here, the complaint was filed pro se, it must be construed liberally 'to raise the strongest arguments [it] suggest[s].'" Walker, 2013 WL 2249159, at *3 (quoting Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006)). However, the Court need not accept as true "conclusions of law or unwarranted deductions of fact[.]" See, e.g., First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994) (citation and quotation omitted). In addition, the fact that Liner is proceeding pro se "does not exempt [him] from compliance with relevant rules of procedural and substantive law[.]" Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983) (citation and quotation marks omitted). A pro se complaint, like any other, "must state a plausible claim for relief." Walker, 2013 WL 2249159, at *3 (citing Harris v. Mills, 572 F.3d 66, 73 (2d Cir. 2009)).

Finally, the Court is mindful of the Second Circuit's recent instruction that "each prisoner complaint alleging a constitutional violation must be carefully analyzed in light of the particular facts contained therein," and that "each complaint is different, and courts have the power and duty to dismiss complaints that contain only conclusory, frivolous, or implausible allegations." Id. at *9.

2.   The Eighth Amendment

42 U.S.C. § 1983 provides a right of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution." In a Section 1983 action claiming an Eighth Amendment violation, an inmate may allege an injury due to "deliberate indifference to a substantial risk of serious harm." Farmer v. Brennan, 511 U.S. 825, 836 (1994). In the context of medical care, "a prisoner must prove 'deliberate indifference to [his] serious medical needs.'"

13

Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle v. Gamble, 492 U.S. 97, 104 (1976)).  A claim of deliberate indifference consists of (1) an objective "medical need" element based on the severity of the alleged deprivation, and (2) a subjective "deliberate indifference" element based on whether the prison official acted with a sufficiently culpable state of mind.  Smith v. Carpenter, 316 F.3d 178, 183-84 (2d Cir. 2003).

 In assessing the objective element, a court must determine "whether the prisoner was actually deprived of adequate medical care," and, second, "whether the inadequacy in medical care is sufficiently serious."  Salahuddin v. Goord, 467 F.3d 263, 279, 280 (2d Cir. 2006) (internal quotation marks omitted); see Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).  If the inadequacy at issue is "a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's [underlying] medical condition is sufficiently serious."  Salahuddin, 467 F.3d at 280.  If, however, "the inadequacy is in the medical treatment given, the seriousness inquiry is narrower."  Id.  Then, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."  Smith, 316 F.3d at 186 (citing Chance, 143 F.3d at 702-03).  While this standard most certainly includes "a condition of urgency, one that may produce death, degeneration, or extreme pain," Hathaway, 99 F.3d at 553, it has also been interpreted to include "less serious denials [of medical attention] which cause or perpetuate pain."  Brock v. Wright, 315 F.3d 158, 163 (2d Cir. 2003).

 In order to meet the subjective element, a plaintiff "must show that the defendant acted with 'more than mere negligence.'"  Walker, 2013 WL 2249159, at *4 (quoting Farmer, 511 U.S. at 835).  "To constitute deliberate indifference, '[t]he prison official must know of, and

disregard, an excessive risk to inmate health or safety.'" Id. (quoting Jabbar v. Fischer, 683 F.3d 54, 57 (2d Cir. 2012)).  This "requires a state of mind that is the equivalent of criminal recklessness[.]" Hathaway, 99 F.3d at 553 (citation omitted).  Thus, prison officials will not be liable under Section 1983 for "a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless[.]" Harrison v. Barkley, 219 F.3d 132, 139 (2d Cir. 2000) (citing Estelle, 429 U.S. at 105-06).

3.    Supervisory Liability

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (internal quotation omitted).  In addition, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676.

The law in this Circuit before Iqbal was that a plaintiff could state a claim against a supervisory defendant in a § 1983 case where the plaintiff alleged that the defendant: (1) participated directly in the alleged constitutional violation; (2) failed to remedy a wrong after learning of it; (3) created a policy or custom under which the violation occurred, or allowed such a policy or custom to continue; (4) was grossly negligent in supervising subordinates who committed the alleged violation; or (5) was deliberately indifferent to ongoing unconstitutional acts.  Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).  The Second Circuit has not ruled as to Iqbal's impact on the factors set forth in Colon.  See Grullon v. City of New Haven, No. 11-3184, 2013 WL 3023464, at *4 (2d Cir. June 19, 2013) (noting Iqbal "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain

15

constitutional violations," but declining to reach that issue).  Moreover, courts in this Circuit are divided as to how many of the Colon factors survive in the wake of Iqbal.  Compare Martinez v. Perilli, No. 09 Civ. 6470 (WHP), 2012 WL 75249, at *4 (S.D.N.Y. Jan. 5, 2012) ("[T]he five Colon categories still apply after Iqbal."), with Bellamy v. Mount Vernon Hosp., No. 07 Civ. 1801 (SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third Colon categories pass Iqbal's muster – a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred."), aff'd 387 F. Appx. 55 (2d Cir. 2010).

This Court agrees with the majority view that "even after the U.S. Supreme Court's decision in Iqbal, these categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated."  Hernandez v. Goord, No. 01 Civ. 9585 (SHS), 2013 WL 2355448, at *7 (S.D.N.Y. May 29, 2013) (internal quotation and citation omitted); see also Shepherd v. Powers, No. 11 Civ. 6860 (LTS) (RLE), 2012 WL 4477241, at *10 (S.D.N.Y. Sept. 27, 2012) (citing cases as to "the apparent majority view" that where "the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth, Eighth or Fourteenth Amendments, the personal involvement analysis set forth in Colon v. Coughlin may still apply.") (internal quotation marks and citation omitted); Hodge v. Sidorowicz, No. 10 Civ. 428 (PAC) (MHD), 2011 WL 6778524, at *16 (S.D.N.Y. Dec. 20, 2011) ("where the claim does not require a showing of discriminatory intent, the personal-involvement analysis set forth in Colon should still apply.") (Report and Recommendation), adopted, Hodge v. Wladyslaw, 2012 WL 701150 (S.D.N.Y. Mar. 6, 2012).

16

**B.      Medical Claims Against Fischer, Koenigsmann, and Perez**

1.      Claims Against Fischer

Liner alleges that Fischer has been deliberately indifferent to his medical needs, and in particular, his need for glaucoma medication and his need for a bottom bunk.  (See Am. Compl. at 13; Pl. Opp. at 4).  However, Liner does not allege any facts suggesting that Fischer was personally involved in the denial of glaucoma medication or a bottom bunk permit, nor does he assert sufficient facts to state a claim pursuant to the other Colon factors.  Although Liner alleges that Fischer must have been aware of his medical claims due to various grievances and letters, the only communication with Fischer that Liner specifically identifies is the May 15, 2010 letter from Liner to Fischer complaining about a female nurse at Wyoming.  (See Pl. Opp. at 23-24).  This letter was written before Liner was incarcerated at Lakeview, where his medical claims allegedly arose, and thus could not contain any description of the medical claims at issue here.

Moreover, even if Liner could describe more clearly the other "over a dozen more letters and responses" between him and Fischer and Koenigsmann, such communication is still not sufficient to allege Fischer's supervisory liability because "[c]ourts in this circuit have said that the receipt of letters or grievances, by itself, does not amount to personal involvement."  Mateo v. Fischer, 682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010) (citing Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997); see also Grullon, 2013 WL 3023464, at *5 (complaint failed to sufficiently allege warden's personal involvement in or awareness of health, safety, and communications issues raised by inmate); Shomo v. City of New York, 579 F.3d 176, 184 (2d Cir. 2009) (dismissing Section 1983 claims against Department of Correction officials for lack of personal involvement when "[t]he only allegation pertaining to [those] defendants [was] that [the plaintiff] filed complaints with [their offices]."); Rivera v. Pataki, No. 04 Civ. 1286 (MBM), 2005 WL 407710,

at *22 (S.D.N.Y. Feb. 7, 2005) ("Simply because [the plaintiff] wrote to these supervisory

officials complaining of mistreatment does not justify holding them liable under § 1983.")

(citing Sealey, 116 F.3d at 51). Accordingly, the deliberate indifference claims against Fischer

should be dismissed.[11]

### 2.    Claims Against Koenigsmann

Liner alleges that Koenigsmann was deliberately indifferent to his medical needs by

"[o]rdering exclusion of eye [d]rop [m]edication for treatment of glaucoma." (Am. Compl. at

18.) However, Liner does not allege any facts to suggest that Koenisgmann was personally

involved in the decision to deny Liner additional glaucoma medication. In addition, Liner has

not alleged facts to suggest that Koenigsmann knew of and disregarded Liner's medical

complaints. As explained above, the unidentified "dozen or more" letters and responses between

Liner, Fischer, and Koenigsmann are not sufficient to allege supervisory liability for deliberate

indifference to Liner's medical needs. See, e.g., Goris v. Breslin, 402 F. App'x 582, 584 (2d Cir.

2010) (dismissal affirmed where prison doctor's personal involvement limited to receipt of two

letters from plaintiff, which he promptly referred to others); Mateo, 682 F. Supp. 2d at 431

(finding no basis for supervisory liability where prison official received plaintiff's letters,

forwarded at least two letters to subordinates for investigation, and sent plaintiff a response,

---

[11] Even if Fischer had ignored Liner's correspondence, it appears that, without more, there would still be no liability under Section 1983. See, e.g., Honig v. Bloomberg, No. 08 Civ. 0541(DAB), 2008 WL 8181103, at *5 (S.D.N.Y. Dec.8, 2008) ("courts have repeatedly found that 'the allegation that a supervisory official ignored a . . . letter protesting unconstitutional conduct is not itself sufficient to allege the personal involvement of the official so as to create liability under § 1983.") (citations omitted). "The general rule is that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violation." Id. (citation omitted).

18

because "[w]ithout more, these allegations prove only the scantest awareness of [Plaintiff's] claims.").

With respect to his skin conditions, Liner alleges that Koenigsmann failed to maintain medical records or supervise medical staff, who provided improper evaluations and treatment and withheld medical care "as punishment." (Am. Compl. at 18.) Liner does not allege any facts concerning Koenigsmann's particular conduct or omissions in record-keeping or supervising his subordinates. Nor does he explain how Koenigsmann was allegedly involved in establishing any prison health policies or practices, or how those policies or practices relate to his claims. Accordingly, these claims against Koenigsmann should also be dismissed.

Liner contends further that Koenigsmann acted with deliberate indifference regarding Liner's need for a bottom bunk and enacted a policy that deprived Liner of a bottom bunk permit. (See Pl. Opp. at 4). Again, Liner fails to allege any facts to explain how Koenigsmann was involved in denying Liner a bottom bunk permit, that Koenigsmann knew Liner sought or was denied a bottom bunk, or that Koenigsmann had any role in creating a policy that led to this result. Thus, this claim against Koenigsmann should be dismissed as well.

3.    Claims Against Perez

Liner alleges that he did not receive his glaucoma medication when he was temporarily transferred to Downstate in March 2011, July 2011, March 2012, and August 2012. (Am. Compl. at 1, 5, 20; Pl. Opp. at 3). He asserts that Perez is responsible for his lack of medication because she was deliberately indifferent to his medical needs, she poorly supervised Downstate staff who were responsible for distributing medication, she implemented a policy that led to the denial of his medication, and she failed to change the conditions at Downstate even after Liner complained about them in grievances and in complaints to Fischer and to the Governor of New York. (Am. Compl. at 20-21).

19

Liner's claims against Perez seem to arise solely from her title as Superintendent of Downstate.  Liner does not allege any specific facts to support his claims that Perez was involved in withholding his medication, nor that she failed to supervise employees.  Moreover, Liner's conclusory allegation that Perez implemented a policy, without more, does not state a claim that Perez was personally involved in any alleged constitutional violation.  See, e.g., Bristol v. Queens County, No. CV 09–5544 (JFB) (AKT), 2013 WL 1121264, at *22 (E.D.N.Y. Feb. 27, 2013) (plaintiff's conclusory allegation that he was detained "'under procedure and practice adopted by [the defendant]'" was insufficient to establish defendant's personal involvement) (Report and Recommendation), adopted, 2013 WL 1120895, at *2 (E.D.N.Y. Mar. 18, 2013); Koehl v. Bernstein, No. 10 Civ. 3808 (SHS) (GWG), 2011 WL 2436817, at *19 (S.D.N.Y. July 17, 2011) ("conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement") (citations omitted) (Report and Recommendation), adopted, 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011).  In addition, as discussed above, letters or complaints are insufficient standing alone to form a predicate for supervisory liability.  Thus, the claims against Perez should be dismissed.

4.    Conspiracy Claims

Liner alleges that Koenigsmann conspired with Wilcox "to deny [P]laintiff his glaucoma [m]edication prescribed by [m]edical eye [s]pecialist" (Am. Comp. at 18), and that Perez conspired with Fischer to interfere with Liner's medical care while he was at Downstate Correctional Facility.  (Id. at 20).  To state a conspiracy claim under Section 1983, a plaintiff must show "(1) an agreement between [two or more state actors or] a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Ciambriello v. Cnty. of Nassau, 292 F.3d 307, 324-

20

25 (2d Cir. 2002) (citing <u>Pangburn v. Culbertson</u>, 200 F.3d 65, 72 (2d Cir. 1999)).  "[A] plaintiff must show that defendants acted in a willful manner, culminating in an agreement, understanding, or meeting of the minds, that violated [his] rights, privileges or immunities secured by the Constitution or federal courts."  <u>Bussey v. Phillips</u>, 419 F. Supp. 2d 569, 586-87 (S.D.N.Y. 2006) (quotation marks and citations omitted).  Moreover, "complaints containing only conclusory, vague, or general allegations [of conspiracy] . . . are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct."  <u>Ciambriello</u>, 292 F.3d at 325 (citation and quotation marks omitted).  Finally, "[a] violated constitutional right is a natural prerequisite to a claim of conspiracy to violate such right."  <u>Romer v. Morgenthau</u>, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000) (citation omitted).

Liner's conspiracy claims should be dismissed because, as explained above, he has failed to allege the personal involvement of Fischer, Koenigsmann, and Perez in any of his claims. Further, even if the Court were to find that those Defendants were personally involved in the events underlying this action, Liner fails to state any nonconclusory allegations pertaining to the existence of a conspiracy, a meeting of the minds to support a conspiracy claim, or any overt acts which would suggest the existence of a conspiracy.  His bare statements that Defendants "conspired" are insufficient to state an actionable claim for conspiracy.  <u>See</u> <u>Nealy v. Berger</u>, No. 08 Civ. 1322 (JFB) (AKT), 2009 WL 704804, at *5 (E.D.N.Y. Mar. 16, 2009) ("The mere use of the term 'conspiracy' . . . is clearly insufficient to satisfy Rule 12(b)(6) in connection with a Section 1983 conspiracy claim.") (citation omitted).  Liner's conspiracy claims therefore should be dismissed.[12]

---

[12] In addition, "[u]nder the 'intracorporate conspiracy' doctrine, the officers, agents, and employees of a single corporate entity, each acting within the scope of [his or] her employment,

## C.  Medical Claims Against Wilcox

### 1.  Personal Involvement

Unlike his claims against the supervisory defendants, Liner alleges that Wilcox was personally involved in the deprivation of his medical care.  Liner asserts that he personally informed Wilcox "several" times that he was not receiving enough glaucoma medication (Pl. Opp. at 2), but Wilcox told him the medication was not being provided due to "'budget cuts'" and stated that "this is coming from out of Albany, they do not believe the other bottle to be [n]ecessary." (Id.).  Liner alleges further that Wilcox was directly responsible for evaluating him for a bottom-bunk permit, but that Wilcox refused to perform the evaluation for two months in order to retaliate against him.  (See Am. Compl. at 15-16).  Liner also contends that he spoke to Wilcox about his need for skin and foot cream and Wilcox told him to purchase those creams through the commissary. (Am. Compl. at 16; see also id. at 18).  In addition, Liner alleges that "[w]hen Wilcox was informed by me of the Court proceeding he stopped [m]y [m]edicated [f]oot [c]reme [o]rder." (Pl. Opp. at 3.)  Thus, Liner has sufficiently alleged, for pleading purposes, that Wilcox was personally involved in the claims relating to his medical care.

---

are legally incapable of conspiring together." Little v. City of New York, 487 F. Supp. 2d 426, 441-42 (S.D.N.Y. 2007) (dismissing § 1983 conspiracy claim against two police officers who worked for City of New York pursuant to intracorporate conspiracy doctrine) (citation and additional quotation marks omitted).  Because all four of the defendants worked for the same corporate entity, DOCCS, and were acting within the scope of their employment with regard to the alleged conduct, the conspiracy claims are further subject to dismissal under the intracorporate conspiracy doctrine.  See id.; Williams v. Fischer, No. 9:09–CV–1258 (NAM/DEP), 2011 WL 1812527, at *10 (N.D.N.Y. Feb. 9, 2011) (dismissing conspiracy claims pursuant to intracorporate conspiracy doctrine where defendants were all employees of New York State Department of Correctional Services), adopted, 2011 WL 843919 (N.D.N.Y. Mar. 8, 2011).

2.      Serious Medical Need

a.      Glaucoma Treatment

Liner alleges that from late 2010 to December 14, 2012, he was provided two bottles of glaucoma medication instead of the three bottles recommended by an eye specialist. (See, e.g., Am. Compl. at 10; Pl. Opp. at 2.) According to Liner, the lack of glaucoma medication caused his vision to deteriorate "at rapid speed" (Am. Compl. at 19), and he asserted that he "could go blind." (Id. at 20).

The Second Circuit has found that eye impairments such as double vision and the loss of depth perception may be serious enough to implicate the Eighth Amendment. See Koehl v. Dalsheim, 85 F.3d 86, 88 (2d Cir.1996). The Court therefore finds that, for pleading purposes, the alleged risk of harm to Liner's vision is sufficiently serious so as to satisfy the requirement that the plaintiff assert a "serious medical need." See, e.g., Hines v. Gandham, No. 9:08 CV 553 (GLS) (DLH), 2009 WL 537541, at *7 (N.D.N.Y. Mar. 3, 2009) (inadequate treatment for glaucoma leading to blurred vision, pain, headaches, and loss of vision in one eye constitutes serious medical condition); St. John v. Arnista, No. 3:05CV120 (WWE) (HBF), 2007 WL 3355385, at *6 (D. Conn. Nov. 9, 2007) (defendant did not contest that glaucoma diagnosis was serious medical condition); Richardson v. Nassau County, 277 F. Supp. 2d 196, 202 (E.D.N.Y. 2003) (reasonable jury could find that existing glaucoma was serious medical condition).

b.      Skin Conditions

Liner has failed, however, to allege a serious medical need with regard to his skin conditions. Liner describes his first skin condition (for which he has allegedly been denied any treatment) as "itchy - erratic dryness" that requires "lotion." (Am. Compl. at 16). He asserts that his second condition (for which he has received treatment, but alleges the treatment was

23

inadequate) as "feet pain and chafting, which turn into cuts when not treated." (Pl. Opp. at 3). In the grievance records submitted by Liner as attachments to his opposition papers, he alternately describes the foot condition as "[f]oot [s]oreness & [p]eeling & itching." (Id., Exhibit B6 (grievance dated May 15, 2010)). Even assuming that Liner's foot condition could, if left completely untreated, constitute a serious medical need, he has not asserted that this is the case (nor does he assert that the condition has significantly worsened or turned into "cuts" due to inadequate treatment). Rather, he complains that he has received an "inadequate dosage" of foot cream and implies that his dosage may have been cut in half. (See Am. Compl. at 16 ("Changing a product good for a week to two weeks, prevents adequate treatment.")).[13]

Taking Liner's skin conditions at their worst, as described they "are not of such an urgent and substantially painful nature as would satisfy the objective prong of the deliberate indifference standard." Swindell v. Supple, No. 02 Civ. 3182 (RWS), 2005 WL 267725, at *7 (S.D.N.Y. Feb. 3, 2005) (where skin condition causing "excessive itching, scratching, soreness from scratching, and cracked skin, appearing as 'small paper-cut like lacerations' on [plaintiff's] legs" as well as "pain when walking around the entire facility" did not rise to level of serious medical need). Accordingly, Liner has failed to show that the denial of care for his skin conditions, as alleged, constitutes a serious medical need for Eighth Amendment purposes.

c.    Chronic Back Pain and Bottom-Bunk Permit

Liner also alleges that Wilcox has provided inadequate treatment for his back pain and that Wilcox wrongfully denied him a bottom-bunk permit despite his back, leg, and bladder

---

[13] Although Liner asserts in his opposition papers that his medication for foot cream was discontinued, in his subsequent motion for a preliminary injunction, he asserts that he is still receiving foot cream but that the dose is inadequate. (See Plaintiff's Affirmation Reply, filed February 21, 2013 (Dkt. No. 60), at 5).

problems.  (See Am. Compl. at 16).  Chronic back pain may give rise to a constitutional claim.

See, e.g., Flemming v. City of New York, No. 03 Civ. 662 (NGG) (LB), 2009 WL 3174060, at

*8, n.9 (E.D.N.Y. Sept. 30, 2009) ("Depending on the circumstances, severe back pain may

qualify as a 'serious medical need.'").  In addition, courts in this Circuit have found that where a

prisoner suffers from severe back injuries, denial of a bottom-bunk permit may, under some

circumstances, constitute deliberate indifference to a prisoner's medical needs.  See Briel v.

Fields, No. 12 Civ. 2868 (JS) (ETB), 2013 WL 1833248, at *3 (E.D.N.Y. May 1, 2013) (denying

motion to dismiss and citing Cole v. Artuz, No. 97 Civ. 977 (RWS), 2000 WL 760749, at *5

(S.D.N.Y. June 12, 2000), and Gill v. Gilder, No. 95 Civ. 7933 (RWS), 1996 WL 103837, at *5

(S.D.N.Y. Mar. 8, 1996)).  Accordingly, Liner's back condition could potentially be sufficiently

serious so as to warrant protection against deliberate indifference.

3.     Deliberate Indifference

a.     Glaucoma Treatment

As discussed above, the subjective prong of an Eighth Amendment claim for deliberate

indifference requires that "the charged official [ ] act with a sufficiently culpable state of mind."

Hathaway, 99 F.3d at 553.  "The required state of mind, equivalent to criminal recklessness, is

that the official 'knows of and disregards an excessive risk to inmate health or safety; the official

must both be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he must also draw the inference.'"  Hemmings v. Gorczyk, 134 F.3d

104, 108 (2d Cir. 1998) (quoting Farmer, 511 U.S. at 837).

Defendants argue that Liner "offers no allegations which would address the subjective

prong" of the deliberate indifference standard with regard to the alleged denial of glaucoma

medication. (Defs. Mem. at 25).  Reading Liner's Amended Complaint and opposition papers

25

liberally, the Court disagrees.  Liner alleges that he personally told Wilcox that he needed

additional glaucoma medication in order to prevent a loss of vision, pain, and headaches, but

Wilcox refused to provide the medication due to "budget cuts."  (See Am. Compl. at 10, 16).

Liner further asserts that despite his numerous complaints, he received insufficient medication

for nearly two years, from late 2010 until December 14, 2012.  (See Pl. Opp. at 2, 5-6, 13).  If, as

Liner alleges, he was denied necessary medication for almost two years, this delay could

potentially be a factor in support of a finding of deliberate indifference.  See Harrison, 219 F.3d

at 138 (rational jury could find that one-year delay in treating cavity amounted to deliberate

indifference); Lloyd v. Lee, 570 F. Supp. 2d 556, 568-69 (S.D.N.Y. 2008) (reasonable jury could

find that 9-month delay in performing MRI scan ordered by doctors constituted deliberate

indifference); see also Stevens v. Goord, 535 F. Supp. 2d 373, 388 (S.D.N.Y. 2008) ("While

disagreements regarding choice of treatment are generally not actionable under the Eighth

Amendment, judgments that have no sound medical basis, contravene professional norms, and

appear designed simply to justify an easier course of treatment (in this case, no treatment) may

provide the basis of a claim.") (citations omitted).

     The Court's duty at this juncture "'is merely to assess the legal feasibility of the

complaint, not to assay the weight of the evidence which might be offered in support thereof.'"

DiFolco, 622 F. 3d at 113 (quoting Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998)).  The

Court makes no findings as to the merits of Liner's deliberate indifference claim against Wilcox,

nor how it may fare once it becomes the topic of discovery.  Nevertheless, the Court finds that

Liner has alleged sufficient facts to potentially satisfy the subjective prong of the deliberate

indifference test with regard to the alleged denial of his glaucoma medication.

`                    b.    Chronic Back Pain and Bottom-Bunk Permit

Liner's claims against Wilcox with regard to his chronic back pain should also survive

the motion to dismiss.  Defendants argue, correctly, that negligently failing to assign a prisoner

to a bottom bunk does not meet the subjective prong for a deliberate indifference claim.  See,

e.g., Felix-Torres v. Graham, 687 F. Supp. 2d 38, 52-53 (N.D.N.Y. 2009) (granting summary

judgment where no rational trier of fact could conclude that Defendant's failure to assign

Plaintiff to a bottom bunk "was anything more than carelessness or negligence").  However, at

this early stage of the case, based on Liner's allegations, the Court may not assume that any

failure to assign Liner to a bottom bunk could only have been negligent.  Liner alleges that

Wilcox was on a "vendetta . . . to sabotage [his] well[-]being," (Am. Compl. at 15), and that

Wilcox initially refused to evaluate him for a bottom bunk in order to retaliate against him for

filing grievances.  (See id. at 15-16).  Liner alleges further that when Wilcox finally filled out the

bottom-bunk evaluation, he did not actually review Liner's medical records (and thus did not see

that a nurse practitioner had already found Liner to be eligible for the permit).  (Id. at 16).  In

addition, Liner asserts that his back problems were brought to Wilcox's attention "on three

different occasions."  (Id. at 19).  Although it is a close question, the Court finds that Liner has

alleged sufficient facts to potentially show that Wilcox acted with deliberate indifference with

regard to his chronic back pain.[14]

---

[14] Defendants cite to Quezada v. Poole, No. 06-CV-2285, 2011 WL 4368450, at *4
(W.D.N.Y. Sept. 19, 2011), for the proposition that negligently failing to assess an inmate's
bunk status does not meet the subjective prong of the deliberate indifference test.  However,
Quezada was decided on a motion for summary judgment, not on a motion to dismiss.

4.    Recommendations

In sum, Liner has pled facts from which an inference could potentially be drawn that Wilcox knew Liner required three bottles of glaucoma medication and a bottom bunk for medical reasons, and that Wilcox deliberately disregarded the consequences of withholding those treatments.  These allegations are sufficient to overcome a motion to dismiss, and thus the motion should be denied with respect to Liner's claims that Wilcox was deliberately indifferent to his glaucoma and chronic back pain.  However, Liner has not shown that his skin conditions constitute a serious medical need and thus the motion to dismiss should be granted with respect to Liner's claim that he was denied skin cream and lotion.

**D.    Retaliation Claim Against Wilcox**

Liner alleges that Wilcox took more than two months to evaluate whether Liner should be given a bottom bunk permit, in retaliation for past complaints (id. at 16), and that when Liner informed him of "the [c]ourt proceeding," Wilcox "stopped [Liner's] [m]edicated [f]oot [c]reme [o]rder." (Pl. Opp. at 3).  Courts approach prisoner retaliation claims "with skepticism and particular care," because "virtually any adverse action taken against a prisoner by a prison official–even those otherwise not rising to the level of a constitutional violation–can be characterized as a constitutionally proscribed retaliatory act." Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002).  Thus, to allege a First Amendment retaliation claim, "a prisoner must show that (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (citation and internal quotation marks omitted).

28

Liner satisfies the first and second factors.  First, filing prison grievances and lawsuits are constitutionally protected activities.  See Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).  As to the second factor, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation."  Dawes, 239 F.3d at 493.  Denial of medical care is sufficient to constitute retaliatory conduct.  See Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009).

In order to satisfy the third requirement of causation, however, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action."  Dawes, 239 F.3d at 492 (internal quotation marks and citation omitted).  Here, Liner has failed to meet his burden.  With regard to the delay in Wilcox's evaluation of his bottom-bunk status, Liner fails to assert any facts that would connect his grievances to the delay in Wilcox's evaluation, nor does he explain when or if Wilcox ever even learned of the grievances or what the grievances alleged.  With regard to Wilcox's decision to discontinue Liner's foot medication, Liner similarly fails to allege sufficient facts to suggest that Wilcox's decision to discontinue the foot cream was connected to Liner's "[c]ourt proceeding."  Given Liner's failure to assert facts that would support a causal connection between his speech and Wilcox's alleged adverse actions, his claims against Wilcox for retaliation should be dismissed.

### E.    Denial of Food

Liner alleges that various officers denied or delayed delivering him food at Gowanda, Wyoming, and Great Meadow Correctional Facilities for up to a month at a time.  (Am. Compl. at 14).  The Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to

29

the health and well being of the inmates who consume it." Robles v. Coughlin, 725 F.2d 12, 15

(2d Cir. 1983) (per curiam) (quotation marks and citation omitted).  Courts have found the

Eighth Amendment to be implicated only where a prisoner's allegations involve a serious and

continued deprivation of nutritionally adequate food.  See, e.g., Reeder v. Artus, No. 09 Civ. 575

(DNH) (DRH), 2010 WL 3636138, at *11 (N.D.N.Y. July 27, 2010) (seven out of twelve days

without meals constituted sufficient deprivation to survive motion to dismiss) (Report and

Recommendation), adopted, 2010 WL 3636132 (N.D.N.Y. Sept. 9, 2010).

Liner's allegation that he was denied food for up to a month could, in theory, state an

Eighth Amendment claim.  However, he does not name as a defendant any individual who was

responsible for the food deprivation, and he does not allege when the food deprivation took

place.  The claim therefore should be dismissed.

### F.    Deprivation of Property and Legal Materials

#### 1.    Deprivation of Property

Liner alleges his property and legal papers were lost or damaged when he was transferred

among Gowanda, Orleans, Clinton, and Elmira Correctional Facilities.  (Am. Compl. at 12).  The

Court construes these allegations as deprivation-of-property claims under the Due Process

Clause of the Fourteenth Amendment, which provides that the State shall not "deprive any

person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1.

However, "a claim for deprivation of property cannot be brought in federal court if the relevant

state court provides an adequate remedy for the deprivation of that property." Key v. Tanoury,

No. 05 Civ. 10461 (SHS), 2006 WL 3208548, at *2 (S.D.N.Y. Nov. 3, 2006) (citing Hudson v.

Palmer, 468 U.S. 517, 533 (1984); Marino v. Ameruso, 837 F.2d 45, 47 (2d Cir.1988)).  "'New

York in fact affords an adequate post-deprivation remedy in the form of, inter alia, a Court of

Claims action' pursuant to N.Y. Comp. Codes R. & Regs. tit. 7, § 1700.3(b)(4)." Davis v. New York, 311 Fed. App'x. 397, 400 (2d Cir. 2009) (quoting Jackson v. Burke, 256 F.3d 93, 96 (2d Cir. 2001)) (additional citation omitted).

Because New York provides an adequate post-deprivation remedy, the loss or destruction of Liner's property "whether intentional or negligent—will not support a due process claim redressable under § 1983." Davis, 311 Fed. App'x. at 400.  In addition, even if New York did not provide such a remedy, Liner has not alleged any facts to explain how Fischer or any other defendant was personally involved in the destruction or loss of his property.  Accordingly, Liner's due process claims relating to his damaged and lost property should be dismissed.[15]

### 2.    Access to the Courts

The Court construes Liner's allegations regarding the damage to, and loss of, his legal materials as claims that Defendants violated his First Amendment right to access the courts.  A prison must ensure that its inmates have "'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'"  Lewis v. Casey, 518 U.S. 343, 351 (1996) (quoting Bounds v. Smith, 430 U.S. 817, 825 (1977)).  However, as explained above, Liner does not identify any individual defendant who was personally involved in the damage to his legal materials.  (See, e.g., Pl. Opp. at 11-12 (describing loss of legal materials without reference to any defendants)).  Accordingly, these claims should be dismissed as well.

---

[15] It is worth noting that Liner was previously advised that he should bring any claims for deprivation of property in the New York Court of Claims rather than in Federal Court.  See Liner v. Fischer, No. 9:08–CV–1386 (TJM/ATB), 2010 WL 3808692, at *7 n.11 (N.D.N.Y. Aug. 4, 2010) (quoting Davis, 311 Fed. App'x at 400, and finding that "[t]o the extent [Liner] claims damage to his personal property, apart from his legal papers, this claim should be dismissed.") (Report and Recommendation), adopted, 2010 WL 3808695 (N.D.N.Y. Sept. 22, 2010).
.

### G.   Disciplinary Due Process at Hearings in May and August 2011

Liner's claims that he was denied due process in his May 19, 2011 and August 11, 2011 disciplinary hearings should also be dismissed.  "In evaluating due process claims, the threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution."  Perry v. McDonald, 280 F.3d 159, 173 (2d Cir. 2001) (citation and quotation marks omitted).  Prisoners subject to disciplinary proceedings can show a liberty interest only where "an institution's disciplinary decision results in an 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'"  Luna v. Pico, 356 F.3d 481, 487 n.3 (2d Cir. 2004) (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)).  In determining whether an inmate endured atypical and significant hardship during punitive segregation, the Second Circuit instructs courts to consider both the duration and conditions of the confinement.  See Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004) ("Factors relevant to determining" whether inmate endured atypical hardship include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation imposed compared to discretionary confinement.") (quotation marks and citation omitted).

The Second Circuit has expressly declined to provide a bright-line rule as to what duration of punitive confinement implicates a prisoner's constitutional rights; however, general guidelines have been defined.  See id.  Confinement for 101 days or fewer under typical punitive segregation conditions "generally do[es] not constitute 'atypical' conditions of confinement."  Bunting v. Nagy, 452 F. Supp. 2d 447, 456 (S.D.N.Y. 2006) (quoting Sealey v. Giltner, 197 F.3d 578, 589 (2d Cir. 1999)).  By contrast, 305 days or more of confinement has been deemed an atypical and significant hardship.  Colon v. Howard, 215 F.3d 227, 231-32 (2d Cir. 2000).  "A

32

period of confinement between 101 and 305 days is considered to be an 'intermediate duration' and could implicate a liberty interest should a detailed record of the conditions of confinement indicate that it was an atypical and significant hardship." Bunting, 452 F. Supp. 2d at 456 (citing Sealey, 197 F.3d at 589).  Even if an inmate is segregated for fewer than 101 days, a violation of his liberty interest may be implicated if "the conditions were more severe than the normal [punitive segregation] conditions . . . or a more fully developed record showed that even relatively brief confinements under normal [punitive segregation] conditions were, in fact, atypical."  Davis v. Barrett, 576 F.3d 129, 133 (2d Cir. 2009) (quoting Palmer, 364 F.3d at 65).

Liner does not allege a prima facie due process violation because he cannot show that Fischer or any other named defendant was personally involved in these hearings.  Liner also does not allege who conducted the hearings, any of the circumstances surrounding his inability to present witnesses, or the evidence used to convict him of the disciplinary charges.  Moreover, he fails to plead any facts, beyond his conclusory allegation of bias, to suggest that the second hearing officer was predisposed to finding him guilty.  Finally, Liner does not allege any facts regarding the conditions of his confinement while he was in punitive segregation for six months.  His allegations therefore do not implicate the requisite liberty interest to state a due process claim.  Liner's due process claims arising from his May 19, 2011 and August 11, 2011 disciplinary hearings therefore should be dismissed.

### H.   Disciplinary Proceedings in 2007

Defendants assert that Liner's claim based on Fischer's March 26, 2007 affirmance of Liner's disciplinary appeal (see Am. Compl. at 5) should be dismissed as untimely.  In New York, the statute of limitations applicable to claims brought under Section 1983 is three years.  Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 225 (2d Cir. 2004) (citations omitted).  The

date the claim accrues is when a plaintiff "knows or should know of the injury that is the basis of [his] action," Woods v. Candela, 13 F.3d 574, 575 (2d Cir. 1994), "not the point at which the consequences of the act become painful," Covington v. City of New York, 916 F. Supp. 282, 285 (S.D.N.Y. 1996) (internal quotations and citations omitted). Liner's claim is based on an event that occurred, at the latest, on March 26, 2007, approximately four and a half years before he filed this action on September 23, 2011. The claim is therefore untimely and should be dismissed.

## I.      DOCCS Collection Policy

Liner brings a claim against Fischer challenging DOCCS' policies with regard to inmate funds and stamps. (Am. Compl. at 2; Pl. Opp. at 15; see also Pl. Collection Mot. at 1 (making clear that claim is brought against Fischer in his role as Commissioner of DOCCS)). Liner asserts that due to a lack of funds, he is unable to send personal mail to family and friends which, he contends, violates his constitutional rights. (Am. Compl. at 2). Liner also asserts that because he has been placed in a high-security housing unit where he does not have phone privileges, mail is the only feasible way for him to contact people outside the prison. (See id.). Liner attributes his complete lack of funds to a DOCCS policy that allows DOCCS to seize 100 percent of an inmate's incoming funds from certain sources in order to pay off the inmate's outstanding debts. (See id.) The DOCCS collection policy is addressed at length in the May 2, 2013 Report and Recommendation and familiarity with the policy will be assumed here. Notably, however, Liner does not raise specific objections to the DOCCS collection policy other than to one of its seemingly unintended consequences: that because all of Liner's new funds are channeled towards paying off his various debts, he has no available funds for postage. (See id. at 2; Pl. Opp. at 15).

34

At its core, Liner's claim is that because he does not have phone privileges or funds for postage, he should be given some allotment of free postage for personal mail. Liner seems to acknowledge in his Amended Complaint that he receives one stamp per month from DOCCS for this purpose and asserts that this amount of postage is "entirely inadequate." (Am. Compl. at 2). However, as discussed in the May 2, 2013 Report and Recommendation, the Second Circuit has held that "an indigent prisoner does not have a constitutional right to unlimited free postage for non-legal mail," and has specifically upheld the one-stamp-per-month policy to which Liner objects. Johnson v. Goord, 445 F.3d 532, 534 (2d Cir. 2006). Accordingly, Liner's original claim that the one-stamp-per-month policy violates the First Amendment is without merit.

On January 2, 2013, approximately eight months after filing the amended complaint, Liner filed a motion for a preliminary injunction in which he alleged, for the first time, that DOCCS had stopped providing any stamps for personal mail approximately nine months earlier. (Pl. Collection Aff. at ¶ 3). In response, Defendants submitted opposition papers along with a supporting declaration contending that Liner is still eligible for one stamp per month for personal mail pursuant to DOCCS' policy. (See Declaration of Deputy Superintendent of Administration William Fennessy ("Fennessy Decl."), at ¶¶ 7-8 (Dkt. No. 58)). Nowhere in Liner's papers does he contend that he has requested a monthly stamp from DOCCS, nor that he has filed any grievances or complaints with regard to not receiving one stamp per month, as he is required to do. Indeed, the proper remedy for Liner if he has not been receiving a monthly stamp in contravention of DOCCS policy is to file a complaint or grievance in the facility where he is incarcerated. As Liner does not appear to have taken any steps to exhaust his administrative

remedies with respect to a claim that he receives no stamps at all for personal mail, his claim should be dismissed as it is not properly before the Court.[16]

**J.      Injunctive Relief**

Liner requests injunctive relief to (1) direct Wilcox and Koenigsmann to "turn over" three bottles of glaucoma medication to Liner (Am. Compl. at 17, 19); (2) prevent Liner from being assigned to a top bunk (id. at 15, 19); (3) require that Wilcox give Liner medical records arising from Liner's visits to an eye specialist (id. at 17); and (4) lift any disciplinary sanctions against Liner and remove them from his record (id. at 15). For the reasons that follow, Liner's claims for injunctive relief should be denied.

---

[16] Although the Second Circuit has not specifically assessed a policy wherein indigent prisoners do not receive any postage for non-legal mail, such policies have been upheld in other circuits. See, e.g., Hersberger v. Scaletta, 33 F.3d 955, 957 (8th Cir. 1994); Van Poyck v. Singletary, 106 F.3d 1558, 1559–60 (11th Cir. 1997). Moreover, this policy was upheld by one district court in this Circuit as applied to a prisoner in a secure housing unit. See Dawes v. Carpenter, 899 F. Supp. 892 (N.D.N.Y. 1995). In Dawes, the plaintiff filed a Section 1983 claim objecting to a change in prison policy that largely eliminated subsidized postage for personal mail. The plaintiff alleged that in the absence of subsidized postage he had "no alternative means of communication" with the outside world because, like Liner, he was incarcerated in a secure housing unit where he lacked phone privileges, and he had outstanding debts that made it infeasible for him to buy stamps on his own. Id. at 899. Dismissing the claim, the Dawes court concluded that "the Constitution does not require the State to subsidize [personal mail] . . . when other means of communication are available to the general prison population." Id. (emphasis added). In reaching this conclusion, the court reasoned that: (1) there was no freestanding right to a subsidy for postage under the First Amendment; and (2) plaintiff lacked alternative means of communication (i.e. phone privileges) because he had justifiably been placed in a secure housing unit as a punishment for misbehavior. Id. After finding that there was a valid penological reason for the revocation of the plaintiff's phone privileges–namely, the state's interest in order and security–the court found that the "incidental" restrictions on plaintiff's ability to communicate with the outside world passed constitutional muster. (Id.).

      1.     <u>Glaucoma Medication</u>

In his opposition papers, Liner states that he has been receiving his full dose of glaucoma

medication since December 14, 2012.  (<u>See</u> Pl. Opp. at 5).  Accordingly, his request for

injunctive relief with regard to glaucoma medication should be denied as moot.

      2.     <u>Bottom Bunk</u>

"Subject matter jurisdiction requires that there be an actual controversy 'at all stages of

review, not merely at the time the complaint is filed.'" <u>Verley v. Wright</u>, No. 02 Civ. 1182

(PKC), 2007 WL 2822199, at *9 (S.D.N.Y. Sept. 27, 2007) (quoting <u>Prins v. Coughlin</u>, 76 F.3d

504, 506 (2d Cir.1996)).  Thus, "an inmate's transfer from a prison facility generally moots

claims for declaratory and injunctive relief against officials of that facility." <u>Salahuddin</u>, 467

F.3d at 272 (citing <u>Prins</u>, 76 F.3d at 506).  Since filing his complaint, Liner has been transferred

from Lakeview to Southport Correctional Facility, and he has not alleged that he is still being

denied a bottom bunk.  Accordingly, his motion for injunctive relief with regard to a bottom

bunk should also be denied as moot.

      3.     <u>Access to Medical Records from Liner "Eye Specialist"</u>

Liner also requests that Wilcox be directed to "turn over all medical orders written by the

eye specialist in [Wilcox's] immediate (possession) or control." (Am. Compl. at 17).  Liner does

not provide any other explanation as to this request, nor does he provide any factual or legal

basis for injunctive relief.  Accordingly, this request should be denied.[17]

      4.     <u>Disciplinary Sanctions Against Liner</u>

As discussed above, Liner has failed to set forth a <u>prima facie</u> due process violation with

---

[17]Liner may, however, be able to obtain this information in discovery.

regard to his disciplinary hearings in 2011, and his claim relating to a 2007 disciplinary appeal is untimely. Accordingly, Liner's requests for injunctive relief with regard to his disciplinary records should likewise be denied.

### K.       Leave to Replead

As discussed above, a pro se complaint should be liberally construed. Walker, 2013 WL 2249159, at *3 (quoting Pabon, 459 F.3d at 248); see also Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir. 1999)). In addition, a pro se litigant should generally be afforded at least one opportunity to re-plead his claims "when a liberal reading of the complaint gives any indication that a valid claim might be stated." Grullon, 2013 WL 3023464, at *5 (internal quotation marks and citations omitted). Thus, a pro se prisoner pursuing civil rights claims may be granted leave to amend where the initial complaint falls short in explaining how supervisory defendants were personally involved in the alleged constitutional violations. See, e.g., Grullon, 2013 WL 3023464, at *5; Shomo, 579 F.3d at 184. However, leave to amend may be "denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)). Moreover, a litigious inmate, "who is quite familiar with the legal system and with pleading requirements," may not be afforded the special solicitude normally afforded pro se litigants. Davidson v. Flynn, 32 F.3d 27, 31 (2d Cir. 1994) (declining to afford "extremely litigious inmate" benefit of lenient treatment normally afforded pro se litigants and thus denying plaintiff opportunity to amend).

In light of Liner's prior opportunities to expand upon his claims, and the specific procedural history of this case, the Court recommends that Liner be denied further leave to

amend.  Liner has had several opportunities to supplement his complaint, both with an Amended

Complaint (Dkt. No. 19) and in the two subsequent motions for injunctive relief.  (Dkt. Nos. 49

& 55).  In addition, after Defendants moved to dismiss the Amended Complaint—based largely

on the grounds that Liner failed to show that the supervisory defendants were personally

involved in the alleged constitutional violations (See Defs. Mem. at 9-19, 23-26)—Liner

responded with opposition papers specifically addressing the personal involvement of the

supervisory defendants (as well as many other arguments), alleging new facts, and attaching

various exhibits to document his grievances and letters to prison officials.  (See generally Pl.

Opp.)  The Court has exercised its discretion to consider Liner's new exhibits and alleged facts.

See supra note 2.  Thus, the Court's conclusions—including its finding that Liner has failed to

show the personal involvement of defendants Fischer, Koenigsman, and Perez—are not based on

a bare complaint, but on both Liner's amended pleading and his specific offer of proof as to the

defendants' personal involvement.

   Moreover, despite the fact that Liner (inaccurately) identified only one prior lawsuit in

his pleadings (see Am. Compl. at 8), it is clear that Liner is an experienced litigator.[18]  Liner's

---

[18] Liner has filed, while a prisoner, almost two dozen cases in the federal district courts in
New York.  See Liner v. City of New York, No. 11 Civ. 5196 (JGK), 2012 WL 5247316
(S.D.N.Y. Oct. 24, 2012); Liner v. Fischer, No. 08–CV–1386 (TJM/ATB), 2010 WL 3808695
(N.D.N.Y. Sept. 22, 2010) Liner v. Goord, No. 98 Civ. 6343L, 582 F. Supp. 2d 431 (W.D.N.Y.
Oct. 9, 2008); Liner v. Artus, No. 08 Civ. 5886 (GEL), 2008 WL 5114485 (S.D.N.Y. Dec. 5,
2008); Liner v. Wright, No. 99-CV-6084L, 463 F. Supp. 2d 365 (W.D.N.Y. Nov. 27, 2006);
Liner v. Goord, No. 98 Civ. 1207 (VM), 115 F. Supp. 2d 432 (S.D.N.Y. Sept. 28, 2000); Liner v.
Moran, No. 96 Civ. 4447 (JSR) (AJP) (S.D.N.Y. Oct. 17, 1997); Liner v. Kane, No. 96 Civ.
1117 (SS) (S.D.N.Y. Apr. 15, 1997); Liner v. Kelly, No. 86 Civ. 864 (W.D.N.Y. June 10, 1996);
Liner v. Food Emporium, No. 96 Civ. 747 (TPG) (S.D.N.Y. Feb. 1, 1996); Liner v. Giuliani, No.
95 Civ. 2587 (TPG) (S.D.N.Y. Apr. 17, 1995); Liner v. Corrin, No. 88 Civ. 055 (N.D.N.Y. Oct.
11, 1994); Liner, et al. v. Coughlin, No. 91 Civ. 1265 (N.D.N.Y. May 6, 1994); Liner v.
Coughlin, No. 91 Civ. 291 (N.D.N.Y. Mar. 21, 1994); Liner v. Cuomo, No. 90 Civ. 7657 (KTD)
(LB) (S.D.N.Y. May 5, 1993); Liner v. Senkowski, No. 92 Civ. 258 (N.D.N.Y. July 31, 1992);

prior litigation encompasses many of the same legal issues presented here, including the personal

involvement of supervisory defendants.  See, e.g., Liner, 2010 WL 3808692, at *5-8

(recommending dismissal of claims against Fischer and superintendent for lack of personal

involvement, and further recommending dismissal of claims of denial of access to the courts,

destruction of personal property, retaliation, and conspiracy) (Report and Recommendation),

adopted, 2010 WL 3808695 (N.D.N.Y. Sept. 22, 2010); Liner v. Goord, 582 F. Supp. 2d 431,

433 (W.D.N.Y. 2008) (dismissing claims against supervisory defendants for lack of personal

involvement); Liner v. Goord, 310 F. Supp. 2d 550, 554-55 (W.D.N.Y. 2004) (granting summary

judgment in part and dismissing claims against supervisory defendants for lack of personal

involvement); Liner v. Goord, 115 F. Supp. 2d 432, 435-36 (S.D.N.Y. 2000) (dismissing

deliberate indifference, conspiracy and due process claims on several bases, including that

supervisory defendant was not personally involved).  Given Liner's sophistication and

experience, his failure to state a claim (or to sufficiently buttress his claims in subsequent

submissions to the Court) cannot be attributed to a typical pro se party's naivete as to the legal

standards at issue.

In sum, in light of Liner's awareness of his burden of pleading, his prior opportunity to

amend the complaint, and his subsequent submissions in support of his claims, further leave to

amend should be denied.

---

Liner v. Fisher, No. 89 Civ. 530 (N.D.N.Y. Nov. 22, 1991); Liner v. Kelly, No. 86 Civ. 1193
(W.D.N.Y. June 4, 1991); Liner v. Coughlin, No. 86 Civ. 477 (W.D.N.Y. June 4, 1991); Liner v.
Ward, No. 88 Civ. 1737 (RPP), 754 F. Supp. 2d 32 (S.D.N.Y. Jan. 3, 1991); Liner v. Coughlin,
No. 90 Civ. 6172 (CLB) (S.D.N.Y. Sept. 25, 1990); Liner v. Abrams, No. 88 Civ. 2326 (TPG),
1988 WL 64819 (S.D.N.Y. June 15, 1988).

## III.    CONCLUSION

For the foregoing reasons, I recommend that the Court (1) dismiss all claims with prejudice against Defendants Fischer, Koenigsmann, and Perez under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and (2) deny Liner's request for injunctive relief against them as moot.  I further recommend that the Court (3) dismiss with prejudice Liner's conspiracy and retaliation claims against Defendant Wilcox under Rule 12(b)(6), (4) deny as moot Liner's request for injunctive relief against Wilcox because Liner is now receiving all three bottles of his glaucoma medication, and (5) dismiss with prejudice Liner's deliberate indifference claim against Wilcox with respect to medical treatment for Liner's skin conditions.  Thus, the only remaining cause of action would be Liner's claim that Wilcox was deliberately indifferent to his medical needs with respect to Liner's glaucoma and chronic back pain.

### PROCEDURE FOR FILING OBJECTIONS
### TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty and the undersigned, United States Courthouse, 500 Pearl Street, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Crotty.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW**.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.  See Thomas v. Arn, 474 U.S. 140 (1985);

41

Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596

F.3d 84, 92 (2d Cir. 2010).  If Liner does not have access to cases cited herein that are reported

on Westlaw, he should request copies from Defendants.  See Lebron v. Sanders, 557 F.3d 76, 79

(2d Cir. 2009).

Dated:  New York, New York
      June 24, 2013

                                              JAMES L. COTT
                                            United States Magistrate Judge

**A copy of this Report and Recommendation has been sent to the following:**

Joshua Liner
#04-A-4086
Southport Correctional Facility
236 Bob Masia Drive
P.O. Box 2000
Pine City, New York 14871-2000